CITIES SERVICE GAS CO. *v.* PEERLESS OIL & GAS CO. ET AL.

No. 153.  Argued November 9–10, 1950.—Decided December 11, 1950.

180

*Glenn W. Clark* argued the cause for appellant. With him on the brief were *Joe Rolston, Jr., Robert R. Mc-Cracken, R. E. Cullison* and *O. R. Stites.*

*T. Murray Robinson* argued the cause for the State of Oklahoma, *Floyd Green* for the Corporation Commission of Oklahoma, and *D. A. Richardson* for the Peerless Oil & Gas Co., appellees. With them on the brief were *Mac Q. Williamson,* Attorney General, and *Fred Hansen,* Assistant Attorney General, for the State of Oklahoma, and *Thomas J. Lee* and *Richard H. Dunn* for the Commissioners of the Land Office of Oklahoma.

Mr. Justice Clark delivered the opinion of the Court.

The issue in this case is the power of a state to fix prices at the wellhead on natural gas produced within its borders and sold interstate. It originates from proceedings before the Oklahoma Corporation Commission which terminated with the promulgation of two orders. The first order set a minimum wellhead price on all gas taken from the Guymon-Hugoton Field, located in Texas County, Oklahoma. The second directed Cities Service, a producer in this field and operator of an interstate gas pipe-line system, to take gas ratably from Peerless, another producer in the same field, at the price incorporated in the first order. The Supreme Court of Okla-

homa upheld both orders against contentions that they contravened the constitution and statutes of Oklahoma and the Fourteenth Amendment and Commerce Clause of the Constitution of the United States. 203 Okla. 35, 220 P. 2d 279 (1950). From this judgment Cities Service appealed to this Court. A substantial federal claim having been duly raised and necessarily denied by the highest state court, we noted probable jurisdiction. 28 U. S. C. § 1257 (2).

## I.

The case may be summarized as follows. The Hugoton Gas Field, 120 miles long and 40 miles wide, lies in the States of Texas, Oklahoma and Kansas. The Oklahoma portion, known as the Guymon-Hugoton Field, has approximately 1,062,000 proven acres with some 300 wells, of which 240 are producing. About 90 percent of Guymon-Hugoton's production is ultimately consumed outside the State. Cities Service, operator of a pipe line connected with the field, owns about 300,000 acres and 123 wells. In addition, it has 94 wells dedicated to it by lease for the life of the field and some 19 wells under term lease, giving it control over 236 of the 300 wells. Aside from the holdings of a few small tract owners and the acreages held in trust by the Oklahoma Land Office—some 49,600 acres—the only reserves in the field not owned by or affiliated with a pipe line are those of Harrington-Marsh with some 75,000 acres and Peerless with about 100,000 acres. Under prevailing market conditions, wellhead prices range from 3.6 to 5 cents per thousand cubic feet, varying prices being paid to different producers at the same time. In contrast, there is evidence that the "commercial heat value" of natural gas, in terms of competitive fuel equivalents, is in excess of 10 cents per thousand cubic feet at the wellhead.

While the Guymon-Hugoton Field has three principal production horizons, they are so interconnected as to make in effect one large reservoir of gas. Cities' wells are located in an area in which the gas pressure is considerably lower than that found beneath the wells of Peerless. As a result, production from Cities' wells was causing drainage from the Peerless section of the field, and Peerless was losing gas even though its wells were not producing.

Having no pipe-line outlet of its own, Peerless offered to sell the potential output of its wells to Cities Service. Cities refused except on the condition that Peerless dedicate all gas from its acreage, at a price of 4 cents per thousand cubic feet, for the life of the leases. Dissatisfied with the price and the other terms, Peerless requested the Oklahoma Corporation Commission (a) to order Cities to make a connection with a Peerless well and purchase the output of that well ratably at a price fixed by the Commission, and (b) to fix the price to be paid by all purchasers of natural gas in the Guymon-Hugoton Field. Shortly thereafter, the Oklahoma Land Office intervened as owner in trust of large acreages in the field. The Land Office alleged that no fair, adequate price for natural gas existed in the field; that existing prices were discriminatory, unjust and arbitrary and if continued would deplete, destroy and exhaust the field within a few years. It joined Peerless' prayer for relief. The Commission thereupon, by written notice, invited all producers and purchasers of gas in the field to appear and participate in the proceedings.

The Commission heard testimony to the effect that the field price of gas has a direct bearing on conservation. Witnesses testified that low prices make enforcement of conservation more difficult, retard exploration and development, and result in abandonment of wells long before all recoverable gas has been extracted. They also

testified that low prices contribute to an uneconomic rate of depletion and economic waste of gas by promoting "inferior" uses.

At the end of the hearings, the Commission concluded that there was no competitive market for gas in the Guymon-Hugoton Field, that the integrated well and pipe-line owners were able to dictate the prices paid to producers without pipe-line outlets, and that as a result gas was being taken from the field at a price below its economic value. It further concluded that the taking of gas at the prevailing prices resulted in both economic and physical waste of gas, loss to producer and royalty owners, loss to the State in gross production taxes, inequitable taking of gas from the common source of supply, and discrimination against various producers in the field. On the basis of these findings, the Commission issued the two orders challenged here. The first provided "that no natural gas shall be taken out of the producing structures or formations in the Guymon-Hugoton field . . . at a price, at the wellhead, of less than 7¢ per thousand cubic feet of natural gas measured at a pressure of 14.65 pounds absolute pressure per square inch." The second directed Cities Service "to take natural gas ratably from . . . [Peerless'] well . . . in accordance with the formula for ratable taking prescribed in Order No. 17867 of this Commission" (a provision not under attack here), and at the same price and pressure terms indicated in the general field-price order.

On appeal to the Oklahoma Supreme Court, Cities Service attacked the orders on the following grounds: (1) that the Commission acted beyond its authority in that Oklahoma statutes did not permit general price-fixing or specific price-fixing at a figure in excess of the prevailing market price, and in that the statutes did not contemplate the prevention of economic, as distinct from physical, waste; (2) that if construed to permit such

price-fixing, the statutes and orders thereunder violated the state constitution; (3) that if so construed, the statutes and orders violated the Due Process and Equal Protection clauses of the Fourteenth Amendment, in that (a) there was no evidence of physical waste in the Guymon-Hugoton Field and the price order cannot be reasonably related to the prevention of waste, (b) the statutes contain no adequate standards governing the Commission's price-fixing powers, (c) the orders are too vague, (d) the proceedings lacked procedural due process, and (e) the specific order discriminates against Cities Service, and the general order, applying only to the Guymon-Hugoton Field, discriminates against those producing or purchasing in that field; (4) that the orders violate the Commerce Clause, Art. I, § 8, in that they cast an undue burden on, and discriminate against, interstate commerce.

The Supreme Court of Oklahoma rejected these claims. It found that the Oklahoma statutes fully empowered the Commission to take the action which it took. The Oklahoma legislature, as early as 1913, declared that gas underlying land is the property of the land owner or his lessee; that gas may be taken from a common source of supply proportionately to the natural flow of the well and that the drilling of a well by an owner or lessee shall be regarded as reducing to possession his share of the gas; that any person taking gas from the field, except in cases not here pertinent, shall take ratably from each owner in proportion to his interest and upon such terms as may be agreed upon; that if no agreement can be reached then the price and terms shall be such as may be fixed by the Corporation Commission after notice and hearing. 52 Okla. Stats. §§ 23–25, 231–233 (1941). These sections explicitly authorize the order requiring Cities to take gas ratably from Peerless and at a specific price. In 1915, Oklahoma strengthened its gas conservation laws by

authorizing regulation of production of gas from a common source when production is in excess of market demand. 52 Okla. Stats. §§ 239–240 (1941). The Commission was authorized to limit the gas taken by any producer to "such proportion of the natural gas that may be marketed without waste" as the natural flow of gas at the wells of such producer bears to the total natural flow of the common source. In authorizing such regulation, the legislature declared that it acted "so as to prevent waste, protect the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another." The Oklahoma Supreme Court construed the 1915 Act to permit the general order setting a minimum price in the field. It further ruled that economic waste was within the contemplation of the statute. Finally, with regard to state questions, it held that the orders did not violate the Oklahoma Constitution.

The Oklahoma court also concluded that the statutes so construed and the orders made thereunder do not violate the Federal Constitution on the grounds relied on by Cities Service. We agree.

## II.

The Due Process and Equal Protection issues raised by appellant are virtually without substance. It is now undeniable that a state may adopt reasonable regulations to prevent economic and physical waste of natural gas. This Court has upheld numerous kinds of state legislation designed to curb waste of natural resources and to protect the correlative rights of owners through ratable taking, *Champlin Refining Co.* v. *Corporation Commission,* 286 U. S. 210 (1932), or to protect the economy of the state. *Railroad Commission* v. *Rowan & Nichols Oil Co.,* 310 U. S. 573 (1940). These ends have been held to justify

control over production even though the uses to which property may profitably be put are restricted. *Walls* v. *Midland Carbon Co.*, 254 U. S. 300 (1920).

Like any other regulation, a price-fixing order is lawful if substantially related to a legitimate end sought to be attained. *Nebbia* v. *New York*, 291 U. S. 502 (1934) and cases therein cited. In the proceedings before the Commission in this case, there was ample evidence to sustain its finding that existing low field prices were resulting in economic waste and conducive to physical waste. That is a sufficient basis for the orders issued. It is no concern of ours that other regulatory devices might be more appropriate, or that less extensive measures might suffice. Such matters are the province of the legislature and the Commission.

We have considered the other arguments raised by appellant concerning Due Process and Equal Protection and find them similarly lacking in merit.

## III.

The Commerce Clause gives to the Congress a power over interstate commerce which is both paramount and broad in scope. But due regard for state legislative functions has long required that this power be treated as not exclusive. *Cooley* v. *Port Wardens*, 12 How. 299 (1851). It is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce. *Parker* v. *Brown*, 317 U. S. 341 (1943); *Milk Control Board* v. *Eisenberg Farm Products*, 306 U. S. 346 (1939); *South Carolina Highway Dept.* v. *Barnwell Bros.*, 303 U. S. 177 (1938). The only requirements consistently recognized have been that the regulation not discriminate against or place an embargo on interstate commerce, that it safeguard an obvious state interest, and that the local interest at stake outweigh

whatever national interest there might be in the prevention of state restrictions. Nor should we lightly translate the quiescence of federal power into an affirmation that the national interest lies in complete freedom from regulation. *South Carolina Highway Dept.* v. *Barnwell Bros., supra.* Compare *Leisy* v. *Hardin,* 135 U. S. 100 (1890), decided prior to the Wilson Act, 26 Stat. 313, with *In re Rahrer,* 140 U. S. 545 (1891), decided thereafter.

That a legitimate local interest is at stake in this case is clear. A state is justifiably concerned with preventing rapid and uneconomic dissipation of one of its chief natural resources. The contention urged by appellant that a group of private producers and royalty owners derive substantial gain from the regulations does not contradict the established connection between the orders and a state-wide interest in conservation. Cf. *Thompson* v. *Consolidated Gas Corp.,* 300 U. S. 55 (1937).

We recognize that there is also a strong national interest in natural gas problems. But it is far from clear that on balance such interest is harmed by the state regulations under attack here. Presumably all consumers, domestic and industrial alike, want to obtain natural gas as cheaply as possible. On the other hand, groups connected with the production and transportation of competing fuels complain of the competition of cheap gas. Moreover, the wellhead price of gas is but a fraction of the price paid by domestic consumers at the burner-tip, so that the field price as herein set may have little or no effect on the domestic delivered price. Some industrial consumers, who get bargain rates on gas for "inferior" uses, may suffer. But strong arguments have been made that the national interest lies in preserving this limited resource for domestic and industrial uses for which natural gas has no completely satisfactory substitute. See generally, Federal Power Commission, Natural Gas Investigation (1948); *Federal Power Comm'n* v. *Hope Natural Gas Co.,*

320 U. S. 591, 657–660 (1944) (dissenting opinion). Insofar as conservation is concerned, the national interest and the interest of producing states may well tend to coincide. In any event, in a field of this complexity with such diverse interests involved, we cannot say that there is a clear national interest so harmed that the state price-fixing orders here employed fall within the ban of the Commerce Clause. *Parker* v. *Brown, supra; Milk Control Board* v. *Eisenberg Farm Products, supra.* Nor is it for us to consider whether Oklahoma's unilateral efforts to conserve gas will be fully effective. See *South Carolina Highway Dept.* v. *Barnwell Bros., supra* at 190–191.

*Hood & Sons* v. *Du Mond,* 336 U. S. 525 (1949), is not inconsistent with this result. The *Hood* case specifically excepted from consideration the question here raised, whether price-fixing was forbidden as an undue burden on interstate commerce. Moreover, the Court carefully distinguished *Eisenberg,* which approved price regulations even though applied to a producer whose entire purchases of milk went directly, without processing, into interstate commerce. The vice in the regulation invalidated by *Hood* was solely that it denied facilities to a company in interstate commerce on the articulated ground that such facilities would divert milk supplies needed by local consumers; in other words, the regulation discriminated against interstate commerce. There is no such problem here. The price regulation applies to all gas taken from the field, whether destined for interstate or intrastate consumers.

Appellant does not contend that the orders conflict with the federal authority asserted by the Natural Gas Act, 52 Stat. 821 (1938), 15 U. S. C. §§ 717 *et seq.* (1948). The Federal Power Commission has not participated in these proceedings. Whether the Gas Act authorizes the Power Commission to set field prices on sales by independent

producers, or leaves that function to the states, is not before this Court.

We hold that on this record the Oklahoma Corporation Commission issued valid orders, and that the decision of the court below should be

*Affirmed.*

MR. JUSTICE BLACK is of the opinion that the alleged federal constitutional questions are frivolous and that the appeal therefore should be dismissed.