**In the Matter of TRADERS COMPRESS COMPANY and its wholly owned subsidiary Pioneer Products, Inc., Debtors.**

**No. BK–72–644.**

United States District Court,
W. D. Oklahoma.

May 29, 1973.

---

H. M. Farrier, Oklahoma City, Okl., Robert N. Naifeh, Norman, Okl., for trustee.

Ronald P. Kane, Chicago, Ill., for S. E. C.

Elmer W. Adams, Tulsa, Okl., for Texaco, Inc.

## MEMORANDUM OPINION

BOHANON, District Judge.

The matter of permanent injunction came on for non-jury trial on April 30, 1973; the Trustee, H. M. Farrier, appearing by his attorney, Robert N. Naifeh; the Securities and Exchange Commission appearing by its attorney, Ronald Kane; and Texaco, Inc., appearing by its attorney, Elmer W. Adams. The briefs having been studied, all evidence introduced and arguments heard, the case was submitted to the Court for its decision, and the Court finds the following facts:

On April 28, 1972, the Debtor Corporation entered into a one-year supply contract with Texaco, Inc., for the purchase of propane. This contract was a renewal of similar contracts that had previously been entered into between the parties for at least the preceding five years.

The terms of the contract provided that Texaco was to supply Debtor Corporation with a minimum of 3,050,000 gallons and a maximum of 3,800,000 gallons of propane, for the twelve-month period from April 1, 1972, through March 31, 1973. In return, Debtor Corporation was to pay $.0525 per gallon, less .0039 per gallon competitive allowance, with a 1% discount being allowed if the propane was paid for within 10 days of the date of the invoice.

The testimony of Debtor's Trustee, H. M. Farrier, at the hearing held in regard to this matter on April 11, 1973, indicated that since the filing of the Petition for Reorganization, the Debtor has not been in default in any payments under this contract, and has even been able to take advantage of the 1% discount. Moreover, Mr. Farrier indicated that the Debtor currently has on deposit with Texaco a $17,000 security deposit, to protect Texaco from any possible loss in its dealings with the Debtor.

The contract also provides that Texaco may terminate said contract at the end of the year, by giving written notice sixty days prior to the termination date. On January 19, 1973, Debtor received written notice from Texaco that, pursuant to this provision of the contract, Texaco desired to terminate the agreement. On March 30, 1973, prior to the expiration of the contract, Mr. Farrier, after exhaustive attempts to renegotiate this contract and/or obtain a supply elsewhere, filed the instant application to restrain Texaco from cancelling this contract. On the same day, the Court entered a temporary restraining order, pending hearings concerning the matter. Such hearings were held on April 11, 1973 and on April 30, 1973.

The testimony of Mr. Farrier, at the April 11 hearing, indicated that Texaco's purported reason for cancelling the contract was the shortage of supply of liquefied petroleum gas (hereinafter referred to as "LPG"). This testimony was confirmed by the testimony and affidavit of J. G. Hackler, a Texaco sales representative in their LPG sales division. Mr. Hackler also stated that Texaco was still supplying LPG products to its own jobbers and to certain other independents. He further stated that no prorata distribution of the LPG products, to these distributors, was presently contemplated, and that Texaco was only able to continue their supply because of its termination of the Debtor.

Mr. Farrier testified that the Debtor supplies approximately 8,500 retail consumers of propane, which include family households, the elderly, and churches. Purchases by these customers are primarily for heating and cooking, and for use by farmers in the operation of their farm equipment (e. g., tractors). Mr. Farrier also testified that Texaco supplies the Debtor with between 23% to 35% of its total supply of propane, which the Debtor then redistributes to these consumers.

Mr. Farrier stated that after he received notification from Texaco of their desire to terminate this agreement, he contacted other suppliers in an attempt to alleviate the hardship that would be created by this termination. These attempts proved to be in vain, as Mr. Farrier discovered that due to prevailing industry conditions, other major suppliers were unwilling to commit themselves to supplying Debtor. In light of these developments, Mr. Farrier stated that if Texaco were allowed to cancel this contract, any chance that the Debtor might once have had to rehabilitate itself would be dissipated. Adjudication, he stated, would be inevitable.

Mr. Farrier also was of the opinion that should the Debtor thus be forced to discontinue supplying these 8,500 consumers, they would have a difficult, if not impossible task, of finding a substitute supplier to meet the needs for the upcoming winter. This opinion was substantiated by officials of the Oklahoma Liquefied Petroleum Gas Board, who have expressed extreme concern over the possible effects of this situation. The witness, Everett Agee, Chief Deputy Director of the Oklahoma Liquefied Petroleum Gas Board, testified that there was a shortage of propane for use in Oklahoma even though the production of propane ranks very high nationally from Oklahoma. He stated that the Board had promulgated rules regulating the sale, distribution and storage of liquefied petroleum gas in the State of Oklahoma in the interest of the health, safety and welfare of the people of the state. He further testified that the possibilities of securing a substitute supply were nil. Mr. Agee further testified that Texaco, Inc. was not in compliance with the rule of the Board requiring the filing of a Quarterly Report as to its production, purchase and sale of liquefied petroleum gas in the State of Oklahoma and had not complied with this rule for some years past as do all other regulated oil companies so affected.

The evidence presented establishes that if Texaco, Inc. were allowed to cancel this contract, not only would the 400 shareholders and 150 creditors of the Debtor be irreparably damaged, but also the 8500 individual customers who depend upon the Debtor for their supply of propane.

## CONCLUSIONS OF LAW

1. THIS COURT HAS JURISDICTION AND POWERS TO PREVENT TEXACO FROM DESTROYING THE VERY PURPOSE OF A CHAPTER X PROCEEDING— THE PRESERVATION OF THE GOING-CONCERN VALUE OF THE BUSINESS OF THIS DEBTOR

In response to the Trustee's Application, Texaco filed objections which stated that (1) the Court had no jurisdiction over the person of Texaco; (2) the Court had no subject matter jurisdiction; and (3) the Court had no jurisdiction to grant, in summary proceedings, the injunction suggested. These very same objections confronted the United States Supreme Court in Contintental Illinois National Bank & Trust Company v. Chicago, Rock Island & Pacific Railway Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), wherein the Court quickly disposed of such objections.

The *Continental* case, *supra,* involved the reorganization of the Chicago, Rock Island & Pacific Railway Co. under § 77 of the Bankruptcy Act (11 U.S.C. § 205). § 77 deals exclusively with railroad reorganizations, and was the counterpart of former § 77(b), which dealt with corporate reorganizations. § 77(b)

was the forerunner to Chapter X (11 U.S.C. § 501 et seq.). During the course of reorganization, certain of the Debtor's secured noteholders sought to sell the collateral held as security. Their contract with the Debtor expressly provided that in the event of default or the appointment of a receiver, the noteholder had authority to sell the collateral. The Trustee prayed that the Court enjoin these noteholders from selling any of the collateral, on the grounds that it would cause substantial and irreparable loss to the estate and impede the effective reorganization of the company.

The Supreme Court affirmed the two lower court decisions and stated that § 2(a)(15) (11 U.S.C. § 11), invests the courts of bankruptcy "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings." The Court went on to state that in the exercise of its equitable powers, the Court did have the authority to issue an injunction whenever necessary to prevent the defeat or impairment of its jurisdiction, and that such authority was inherent in the court of bankruptcy, as a duly established court of equity.

Noteworthy in this regard, is the fact that the Court distinguished the application of this broad power in a reorganization proceeding from an ordinary bankruptcy. The Court stated that:

"It may be that in an ordinary bankruptcy proceeding the issue of an injunction in the circumstances here presented . would not be sustained . . . But a proceeding under section 77 is not an ordinary proceeding in bankruptcy. It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised. And to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile.

"The bankruptcy court, in granting the injunction, was well within its power, either as a virtual court of eq-

uity, or under the broad provisions of section 2(15) of the Bankruptcy Act, 11 U.S.C.A. § 11(15), or of section 262 of the Judicial Code, U.S.C. title 28, § 377." (294 U.S. at 676, 55 S.Ct. at 606.)

As in the *Continental* case, *supra*, the instant case also involves a special proceeding through which the Debtor is entitled to rehabilitate itself, and the same principles stated above must be applied to this Chapter X proceeding. Therefore, since Texaco's cancellation of this contract, would prevent the ultimate goal of Chapter X—the reorganization of the Debtor—this Court can exercise its powers to prevent Texaco from obstructing this goal.

During the period of the Trustee's administration of this estate, the Debtor has demonstrated that it can be successfully reorganized into a viable and profitable entity. If Texaco is allowed to thwart the Trustee's efforts, not only will this reorganization be impossible, but also, Texaco will have irreparably damaged Debtor's 400 shareholders and 150 creditors. Also irreparably damaged, will be the 8,500 customers of the Debtor. These individuals will find it virtually impossible to secure a source of propane elsewhere. The elderly, churches, and family households, all customers of the Debtor, will have extreme difficulty in providing themselves with heat for the upcoming winter. Moreover, farmers will be faced with a possible loss of their livelihood, if they are unable to secure propane with which to operate their equipment.

In two other reported cases, the bankruptcy courts have relied upon the *Continental* case, *supra*, and § 2a(15) (11 U.S.C. § 11(a)(15)) to preserve the going-concern value of the business of a debtor. The first is the case of In re Rosenbaum Grain Corporation, 13 F. Supp. 601 (N.D.Ill.1935), a Chapter X proceeding, decided less than a year after the *Continental* decision, *supra*.

*Rosenbaum, supra,* involved a contractual relationship which existed between

the Debtor, a commodities trading corporation and the Chicago Board of Trade, with which the Debtor was registered. The contract provided that when any member failed to meet its engagements, or becomes insolvent, such member would be suspended. When the Debtor filed its Chapter X petition, the Board took action to suspend the Debtor in accordance with the provisions of the contract. Obviously, if such suspension occurred, the Debtor would have had little chance of reorganizing. Therefore, the Debtor's Trustee sought to enjoin the cancellation of this contract, and the district court issued such injunction.

Citing with approval the *Continental* case, *supra,* the court stated that:

"I have said that the property right of the members of the Board is a right subject to the qualifications of the contract by which they became members. That is true, but it is also true that a bankruptcy court may, when it is necessary for the proper administration of the estate of a bankrupt or debtor, interfere to prevent the enforcement of rights growing out of contract . . . . and I believe that this court has power to restrain the Board from suspending the registered members of the debtor arbitrarily, or on insufficient evidence although the Supreme Court of Illinois has held that the sufficiency of the evidence to authorize the expulsion of a member may not be inquired into by the courts." (13 F.Supp. at 604–605)

The *Rosenbaum* case, *supra,* was later cited with approval in In re Merritt Lumber Co., 336 F.Supp. 325 (E.D.Pa. 1971). The *Merritt* case, *supra,* involved a Chapter XI proceeding, wherein the Debtor sought to enjoin the cancellation of certain fire insurance policies covering the properties of the Debtor.

The insurance company involved, specialized in insuring retail lumber businesses. The contract stated that upon written notice, the insurance company could cancel the policy. There was no dispute, that this was a valid provision under Pennsylvania law. At the hearing the receiver stated that he had been unable to replace this insurance with any other insurance company and that unless there was valid fire insurance coverage, he would be unable to operate the Debtor's business.

In upholding the receiver's application, the court stated that:

"Section 2a(15) of the Bankruptcy Act provides that the courts of bankruptcy shall have the jurisdiction to:

'Make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this [Act] . . . .'

"The provisions of § 2a(15) are applicable to Chapter XI proceedings. 8 Collier on Bankruptcy ¶3.23 r. 3 (14th ed. 1969). Injunctions may be issued, when necessary, to prevent the defeat or impairment of the jurisdiction of the bankruptcy court, to enforce the provisions of the Act, and to effect the object of the proceedings free from interference. 8 Collier on Bankruptcy ¶3.23 at 276 (14th ed. 1969)." (336 F.Supp. at 327).

The court further reiterated the well-established principle that the very purpose of a reorganization proceeding, as contrasted to straight bankruptcy, is the preservation of the going-concern value of the business of the Debtor. Therefore, the court concluded that since a finding for the insurance company would effectively destroy the value of the Debtor's business, it must enjoin the insurance company from cancelling the contract.

All of these cases involve issues and factual disputes identical to the instant controversy. They all involve the existence of a valid contractual right to cease dealing with the debtors involved, and they all involve the fact that, should the contract be literally enforced, the debtors' ability to reorganize would be obstructed. Under these circumstances, the courts have uniformly enjoined the cancellation of such contracts.

In this regard, it should be noted that courts, in restricting such contracts, do not violate either the due process clause of the Constitution or the provision of the Constitution relating to impairment of contracts. The cases cited above, all rely on the language of the *Continental* case, *supra*, in so holding.

In discussing these questions, the Supreme Court first noted that Article I, § 8, cl. 4 of the Constitution vests Congress with the power to "establish . . . . uniform Laws. on the subject of Bankruptcies throughout the United States," and that reorganization proceedings come within the confines of this provision. The Court further stated that:

> "Speaking generally, it may be said that Congress, while without power to impair the obligation of contracts by laws acting directly and independently to that end, undeniably, has authority to pass legislation pertinent to any of the powers conferred by the Constitution however it may operate collaterally or incidentally to impair or destroy the obligation of private contracts." (294 U.S. 680, 55 S.Ct. 608.)

Therefore, the Court held that they had the power to delay the enforcement of contract in order to effect a reorganization of a company.

2. TEXACO, UNDER BOTH COMMON AND STATUTORY LAW, COMES WITHIN THE DEFINITION OF A PUBLIC UTILITY, AND AS SUCH, IS PROHIBITED FROM CANCELLING THIS CONTRACT IN THIS DISCRIMINATORY MANNER

At the April 11 and April 30 hearings, several important facts relating to this issue were adduced. It was first established that Texaco supplies the Debtor with propane for sale to its 8,500 consumers for their use to heat their homes and maintain their livelihoods. Moreover, it was established that although Texaco has attempted termination of its supply to the Debtor, it has not terminated the supply of their own jobbers and certain other independents. The only reason given for such termination was the shortage supply. These factors establish *prima facie*, that Texaco is engaging in an arbitrary and discriminatory practice against the Debtor, which practice may be enjoined by this Court. Because of the status of Texaco as a public or quasi-public utility within the meaning of both common and statutory law, this Court may enter the relief requested.

Our Anglo-American utility law was grounded for over three centuries on the declaration of Lord Chief Justice Hale, in his *De Portibus Maris*, that when private property is "affected with a public interest," it ceases to be *juris privati* only.[1]

Our own Supreme Court in Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1876), interpreted and expanded this common law concept when it faced the question of whether Illinois had the power to fix the maximum of charges for the storage of grain in public warehouses. In holding that Illinois had such power, the Court stated:

> "This brings to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is 'affected with a public interest,' it ceases to be *juris privati* only. . . . Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use and must submit to be controlled by the public for the common

---

1. Hargrave Law Tracts 78 (1787).

good, to the extent of the interest he has thus created."

(94 U.S. at 113).

The Court went on to hold that since the community at large was affected by the storage of grain, the control over such storage was thus justified. This same principle, which is still good law, is equally applicable to the current situation. The Court, here, is faced with the fact that if Texaco is allowed to discriminatorily cancel this contract, a community of interest of almost 9,000 people will be adversely affected. Moreover, there can be little doubt that Texaco has held itself out to the public as one of the few producers of liquefied petroleum gas. The public relies on Texaco to supply intermediaries, such as the Debtor, with this product, in order that they might heat their homes and churches, and in order that they might maintain the land from which they are give sustenance. Under these circumstances, this Court can control Texaco "for the common good," and prevent them from perpetrating, upon this Debtor, this discriminatory cancellation.[2]

By cancelling this contract, while arbitrarily maintaining those of their own and other distributors, Texaco is in fact discriminating against this Debtor. Why was the Debtor chosen to be terminated over other distributors, expecially after so many years of successful and profitable dealings with the Debtor? No valid reason could be given by Texaco, other than a recitation of the currently all too familiar litany, "that we cancelled because of a shortage of supply." If in fact this is true, why didn't Texaco treat all of these distributors uniformly, with a pro rata reduction of supply, rather than arbitrarily and discriminatorily terminating the Debtor? Again, Texaco cannot give any valid answers to these questions, nor any plausible justification for such discrimination.

Such undue discrimination has uniformly been banned. The Supreme Court, speaking through Justice Clarke forty years ago, used language which is still apposite:

"Corporations which devote their property to a public use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve, and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render." [3]

Obviously, this language is appropriate for application to the current situation. If Texaco is allowed to discriminate in favor of its own jobbers and other suppliers, to the detriment of this Debtor, merely because to do so might be convenient or more profitable for Texaco, they will be leaving the customers of the Debtor in extreme "discomfort without the services which they alone can render."

This common law approach, that one who holds himself out to the public must do so without discrimination, has been adopted under the laws of Oklahoma. The Oklahoma statute, 17 Okl.St.Ann. § 151, gives the definition of a public utility as follows:

"The term 'Public Utility' . . . shall be taken to mean and include every corporation, association, company, individuals, their trustees, lessees, or receivers, successors or assigns, . . . that now or hereafter may own, operate, or manage any plant or equipment, or any part thereof, directly or indirectly, for public use, or may supply any commodity to be furnished to the public.

---

2. See Nebbia v. New York, 291 U.S. 502, 538–539, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934), wherein the Court held that:

"The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people."

3. New York & Q. Gas Co. v. McCall, 245 U. S. 345, 351, 38 S.Ct. 122, 124, 62 L.Ed. 337 (1917).

(a) For the conveyance of gas by pipe line.

(b) For the production, transmission, delivery or furnishing of heat or light with gas.

(d) For the transportation, delivery or furnishing of water for domestic purposes or for power.

Under this broad definition, it is clear, that Texaco, under the laws of Oklahoma, is such a public utility. It cannot be denied that Texaco is a corporation, which operates a plant, directly and indirectly, for public use in the supply of the LPG. Nor can it be denied, that Texaco is a corporation, which directly and indirectly, furnishes commodity, to the public for its general use. The public nature of the function of Texaco in supplying this propane for heating, cooking, and other uses, is obvious. Therefore, Texaco comes within the letter, purpose, and spirit of this definition of a public utility, and thus, is subject to the laws and cases thereunder.

This obligation of a public service company was discussed in a somewhat more recent case, Oklahoma Natural Gas Co. v. Young, 116 F.2d 720 (10th Cir. 1940). That case involved an action by a customer of Oklahoma Natural Gas for injuries she sustained when the company discontinued her heating supply. The Tenth Circuit, while holding that such a company could shut off the gas if payments were delinquent, stated that: "[I]t is the duty of a utility company to exercise its franchise to serve individuals who desire to be served without discrimination between them.

Under this line of reasoning, Texaco should be enjoined from arbitrarily discriminating against the Debtor in favor of its own jobbers and other distributors. Texaco should be required to treat all such distributors in a uniform manner, possibly in some type of pro rata manner. In any event, Texaco should not be allowed to discriminate against the Debtor, and thereby, irreparably in-jure these creditors, shareholders, and consumers.

3. OKLAHOMA LAW GOVERNING THE SALE OF LIQUIFIED PETROLEUM GAS PROHIBITS TEXACO FROM CANCELLING THIS CONTRACT

Title 52 Okla.St.Ann. § 420.-1–420.16, concerns the regulation of the sale, distribution, and storage of liquefied petroleum gas. The regulation of LPG pursuant to this statute is further support of the contention that Texaco comes with the definition of a public or quasi public utility. This statute created an Oklahoma Liquefied Petroleum Gas Board as the regulatory agency of this product. The Board promulgates rules and regulations and enforces the laws of Oklahoma relating to the liquefied petroleum gas industry in the state.

Section 420.3(c), states that the said Board is empowered to prescribe and adopt rules and regulations and/or specifications relating to safety in storage, distributions, transporting and utilization of Liquefied Petroleum Gas in this State.

The Court recognizes that this statute regulated primarily the distributors of liquefied petroleum gas (hereinafter referred to as "LPG"). However, Texaco, as a producer and supplier of LPG has registered with the LPG Board, and has thereby submitted itself to the provisions of this statute and the rules and regulations thereunder.

Rule 1, promulgated under this statute provides *inter alia,* that:

"These rules are intended to implement the public policy to carry out the Board's statutory duty of regulation in the interest of public safety. In case of any doubt as to the meaning of any language of these rules, such construction shall be adopted which is consistent with the Constitution and laws of the State of Oklahoma and the general public policy as enunciated by the Legislature providing for *the reg-*

*ulation of such activities in the interest of public safety.*" (emphasis supplied)

Under the statute and this rule, Texaco should be enjoined from cancelling this contract because of its adverse effect upon the public safety and welfare. Both the Administrator and Chief Deputy Administrator of the LPG Board, support this contention. If this cancellation is presently allowed, the welfare of these 8,500 consumers will almost certainly be in jeopardy. The evidence has already established that they will have a difficult, if not impossible task, in securing a substitute supply of LPG. Those that are unable to locate a substitute, will be without heat in the upcoming winter and without fuel to operate their tractors this spring and summer. Certainly under these circumstances, the interest of public safety and welfare must be protected as defined in this statute.

The Court recognizes that this issue is probably of first impression, but in the interest of the public good, should not abstain from deciding this issue. This Court has been involved with the interpretation and construction of this statute in Gorum v. Oklahoma Liquefied Petroleum Gas Bd., 235 F.Supp. 406 (W. D.Okl.1964).

Although the *Gorum* case, *supra*, involved the upholding of the constitutionality of this statute, certain language in the case is noteworthy. Judge Daugherty, the author of the opinion by the three-judge court, stated that:

"A state may regulate matters of local concern over which Federal authority has not been exercised even though the regulation has some impact on interstate commerce, provided, that the regulation does not discriminate against or place an embargo on interstate commerce, that it safeguards an obvious state interest and the local interest outweighs whatever national interest there might be in the prevention of state regulation. Cities Service Gas Co. v. Peerless Oil and Gas Co., et al., 340 U.S. 179, 71 S.Ct. 215,

95 L.Ed. 190. As viewed by this Court the storage and sale of liquefied petroleum gas in Oklahoma is an intrastate activity carried on by a foreign corporation therein and a matter of local concern. The regulation of such industry and activity is a proper exercise of the state's power." (235 F.Supp. at 411).

Judge Daugherty went on to state that:

"The exercise of police power by a state is aimed at the conduct, activities and operations of people within the state in the interest of the health, welfare and safety of the people of the state in general. If the plaintiff corporation were permitted to enter Oklahoma and engage in the liquefied petroleum gas business therein under a registration permit, then the plaintiff corporation would be subject in its operation to comply with pertinent laws, rules and regulations prescribed by the State of Oklahoma in the exercise of its police power in regulating the liquefied petroleum gas industry within its borders." (235 F.Supp. at 412).

The clear import of this language indicates that this Court has the power to enjoin this cancellation, if to do so would uphold the pertinent laws, rules and regulations of Oklahoma, relating to the liquefied petroleum gas industry. Therefore, since the health, safety, and welfare of the 8,500 consumers will be irreparably injured by the actions of Texaco, this statute will have been violated, and this Court has the authority to prevent such violation.

4. UNDER OKLAHOMA ANTI-TRUST LAW, TEXACO IS A PUBLIC BUSINESS AND AS SUCH MAY NOT UNJUSTLY DISCRIMINATE AGAINST THE DEBTOR

■ Title 79 Okl.St.Ann. § 4, is one section of Oklahoma's anti-trust statute, which states that:

"Whenever any business, by reason of its nature, extent, or the existence of a virtual monopoly therein, is such that the public must use the same, or

its services, or the consideration by it given or taken or offered, or the commodities bought or sold herein are offered or taken by purchase or sale in such a manner as to make it of public consequence or to affect the community at large as to supply, demand, or price or rate thereof, or said business is conducted in violation of the first section of this Article, said business is a public business, and subject to be controlled by the State, by the Corporation Commission or by an action in any district court of the State, as to all of its practices, prices, rates and charges. *And it is hereby declared to be the duty of any person, firm, or corporation engaged in any public business to render its services and offer its commodities or either upon reasonable terms without discrimination and adequately to the needs of the public, considering the facilities or said business.*" (emphasis supplied)

It is the Trustee's contention that Texaco comes within the letter, purpose, and spirit of this statute. The nature and extent of Texaco's sale and manufacture of LPG is such that the public must use such LPG for their necessities. Therefore, the LPG is a commodity which Texaco sells in a manner to make it of public consequence. The public consequence of Texaco's action in the instant controversy, is that if they are allowed to terminate Debtor's supply, 8,500 consumers will probably be without heat for the upcoming winter and without fuel necessary to maintain their land.

Under these circumstances, Texaco is a "public business" within the meaning of this statute, and as such, is subject to be controlled "by the State, by the Corporation Commission, or by an action in any district court of the state." Having come within this classification of a public business, Texaco is required, by the statute, to offer this LPG "without discrimination and adequately to the needs of the public."

Texaco's current action clearly violates these requirements. If this cancellation is allowed, Texaco will be discriminating against the Debtor in favor of its own jobbers and other distributors. As already demonstrated, this discriminatory termination is arbitrary and unjust. Moreover, if this cancellation is allowed, Texaco will fail to adequately serve the needs of the public. These 8,500 consumers will find it difficult, if not impossible, to find a substitute supply of LPG, and will, thereby, suffer irreparable injury. Under such circumstances, this Court can enjoin the cancellation of this contract and uphold the intent of this statute.

An early case interpreting the forerunner of this section,[4] was Shawnee Gas & Electric Co. v. Corporation Commission, 35 Okl. 454, 130 P. 127 (1913), wherein it was stated that:

"This section provides that whenever a business shall have certain characteristics, it shall be a public business, and shall be subject to the jurisdiction of the Corporation Commission to regulate its practices, rates, and prices; but it does not provide that all public business shall be subject in these respects to such jurisdiction. * * * The first part of said section attempts to define the class of business which the latter part of the section subjects to the jurisdiction of the Corporation Commission and the district courts. It appears to us clear that what was intended was to bring within the jurisdiction of the Commission the regulation of charges and rates for services connected with those businesses that violate the acts and are connected, not with business strictly of a public character, such as common carriage, supply of water and gas, but with that class of business in which the owners, without any intent of public service, have placed their property in such a position that the public has an interest in its use. The distinction between the class of business and its service intended to be defined by and

---

4. Section 13, Sess. Law 1907–08, c. 83, which statute was identical to 79 O.S.A. § 4.

included in said section and the business and service of public corporations is, we think, well made by Mr. Justice Brewer, who delivered the opinion of the court in Cotting v. Godard, 183 U.S. 79 [22 S.Ct. 30, 46 L.Ed. 92], in the following language: 'In the one [referring to property devoted to public service] the owner has intentionally devoted his property to the discharge of a public service. In the other, he has placed his property in such a position that, willingly or unwillingly, the public has acquired an interest in its use. In the one he deliberately undertakes to do that which is a proper work for the state. In the other, in pursuit of merely private gain, he has placed his property in such a position that the public has become interested in its use. In the one it may be said that he voluntarily accepts all the conditions of the public service which attach to like service performed by the state itself; in the other, that he submits to only those necessary interferences and regulations which the public interest require.' It was this second class of business with which we think section 13 was dealing and intended to place under the jurisdiction of the Corporation Commission and the district courts of the state as to all practices, rates, and charges."

The *Shawnee* case, *supra,* was later cited with approval in Oklahoma Gin Co. v. State, 63 Okl. 10, 158 P. 629 (1916).[5] In that case, the Court upheld the constitutionality of this statute and held that a company holding itself out to the public as a ginning operation, was a public business within the meaning of this statute.

In Consumers' Light & Power Co. v. Phipps, 120 Okl. 223, 251 P. 63 (1926), a company which furnished ice, during a period when such was a household necessity, was also held to be a public business within the meaning of this statute.

In rendering its decision, the Court held that such public business could not arbitrarily discriminate among those whom it serves. The Court stated that:

"Under the common law, it was the duty of all persons engaged in a 'public business' to treat all members of the public fairly and without discrimination and to serve all who are similarly situated or in the same class on equal terms and at reasonable rates. Section 11032 of our statute is merely declaratory of the common law in that respect . . . . The discrimination that is prohibited must be an arbitrary or an unjust discrimination." (251 P. at 65)

Thus, because Texaco supplies LPG, which is ultimately used by the public in the maintenance of their homes and lands, and because Texaco is unjustly and arbitrarily discriminating against the Debtor, this statute has been violated. This Court, under the power granted by the statute can enjoin such violation and restrain Texaco from irreparably damaging this Debtor, the 396 shareholders, the 150 creditors, and the 8,500 consumers.

### DECISION

Based on the foregoing Findings of Fact and Conclusions of Law, Trustee has shown himself to be entitled to the relief sought and judgment should be entered herein granting to said Trustee on behalf of the Debtor, a permanent injunction against Texaco, Inc., Respondent, restraining said Respondent from non-compliance and non-renewal of the supply contract by and between it and the Debtor. Bond on the permanent injunction is fixed at the sum of One thousand dollars ($1000.00) and said Bond to be filed with the Court. Counsel for the Trustee will prepare a judgment granting the permanent injunction, present the same to opposing counsel for approval as to form and then present the same to the Court for signature and entry herein.

---

5. This case was later reversed on other grounds in 252 U.S. 339, 40 S.Ct. 341, 64 L.Ed. 600 (1919).