SUTTON, Circuit Judge,
concurring.
I join Judge Clay’s opinion in full. I write separately to express skepticism about the extraterritoriality doctrine, the fulcrum of today’s decision and a branch of the dormant Commerce Clause that the Supreme Court last referred to nine years ago as the doctrine “applied in Baldwin and Healy,” decisions from 1935 and 1989. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 669, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003); see Healy v. Beer Inst., 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).
A little history helps to explain how the extraterritoriality doctrine became the “dormant branch of the dormant Commerce Clause.” IMS Health Inc. v. Mills, 616 F.3d 7, 29 n. 27 (1st Cir.2010), abrogated on other grounds by Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). To the founding generation, it was an article of common faith that “no state or nation can, by its laws, directly affect, or bind property out of its own territory, or bind persons not resident therein.” Joseph Story, Commentary on the Conflict of Laws § 20 (1834). A State’s power to “protect the lives, health, and property” of its residents was “essentially exclusive,” United States v. E.C. Knight Co., 156 U.S. 1, 11, 15 S.Ct. 249, 39 L.Ed. 325 (1895), given the then-modest regulatory authority of the National Government under the Commerce Clause. And no State could regulate “except with reference to its own jurisdiction” because each State’s powers ended at its borders. Bonaparte v. Tax Court, 104 U.S. 592, 594, 26 L.Ed. 845 (1881). On the other side of the dual-sovereignty coin, the Federal Government’s power “to regulate commerce among the several states” was “also exclusive.” E.C. Knight, 156 U.S. at 11, 15 S.Ct. 249. A structural challenge to a state or federal regulation thus required courts - to determine “whether ■ the right government was acting within the right sphere.” Ernest A. Young, “The Ordinary Diet of the Law”: The Presumption Against Preemption in the Roberts Court, 2011 Sup.Ct. Rev. 253, 257.
Over time, the lines between the separate spheres blurred, in part because the nature of commerce changed, in part because the Supreme Court’s interpretation of the Commerce. Clause changed. The Federal Government gained power over traditionally “local” activities, ending the States’ exclusive regulatory power. See, e.g., United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). And the States began to regulate commerce that eventually would cross state lines,. ending the Federal Government’s exclusive authority. If States did not discriminate against out-of-state interests or disproportionately burden interstate commerce, they could share regulatory authority with the Federal Government, at least so long as Congress did not exercise its option of regulating the area exclusively. See, e.g., S.C. Highway Dep’t v. Barnwell Bros., Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938) (upholding a state statute regulating the size of trucks using the State’s highways despite the law’s burden on interstate commerce); Milk Control Bd. v. Eisenberg, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939) (upholding a state statute setting minimum prices for milk shipped for sale out of state); Duckworth v. Arkansas, 314 U.S. 390, 62 S.Ct. 311, 86 L.Ed. 294 (1941) (upholding a state statute requiring a license to transport liquor *378 through the state); see also Wiley Rutledge, A Declaration of Legal Faith 68 (1947) (“[J]ust as in recent years the permissive scope for congressional commerce action has broadened ... the prohibitive effect of the clause has been progressively narrowed. The trend has been toward sustaining state regulation formerly regarded as inconsistent with Congress’ unexercised power over commerce.”).
One measure of this transformation, from using the Commerce Clause to monitor largely exclusive spheres of authority to overseeing largely overlapping spheres of authority, is this: Today, a State may fix the price of natural gas drilled within its borders and purchased at the wellhead, even when 90 percent of the gas will be shipped out of state. Cities Serv. Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950). And today the Federal Government may regulate local loan sharking that never crosses state lines. Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).
Which brings me back to extraterritoriality. Is it possible that the extraterritoriality doctrine, at least as a freestanding branch of the dormant Commerce Clause, is a relic of the old world with no useful role to play in the new? I am inclined to think so.
When the central function of the dormant Commerce Clause was to keep the States and the Federal Government in their separate spheres of regulatory authority, it made sense to think of extraterritoriality as a relevant proxy for interstate-commerce violations. Extraterritorial lawmaking after all operates on one side of this line and territorial lawmaking operates on the other. But that line has come and gone. The key point of today’s dormant Commerce Clause jurisprudence is to prevent States from discriminating against out-of-state entities in favor of in-state ones.
Yet the extraterritoriality doctrine, if taken seriously (or at least as seriously as Healy has taken it), has nothing to do with favoritism. Even state laws that neither discriminate against out-of-state interests nor disproportionately burden interstate commerce may run afoul of extraterritoriality, as this case well shows. All three of us agree that the Michigan redemption law does not favor in-state entities at the expense of out-of-state ones, and yet all three of us agree that the law violates the extraterritoriality doctrine applied in Healy. That is because, if a State regulates “commerce that takes place wholly outside of the State’s borders,” that regulation is automatically invalid, no matter how great the regulation’s local benefit, no matter how small its out-of-state burden. Healy, 491 U.S. at 336, 109 S.Ct. 2491; see also Edgar v. MITE Corp., 457 U.S. 624, 642-43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion) (stating that an extraterritorial regulation of tender offers was invalid “whether or not the commerce has effects within the State”); Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 583, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (striking down New York’s price-affirmation law based on its extraterritorial effect). Even a hypothetical state law that facilitated interstate commerce — say, an Ohio law, that gave tax credits to automobile companies that keep open the production lines of their factories in Michigan and elsewhere — would be invalid if it had extraterritorial “practical effect[s].” Healy, 491 U.S. at 336, 109 S.Ct. 2491. Whatever role extraterritoriality once played in Commerce Clause law, it is difficult to perceive the interstate-commerce function it plays today.
Not just the original function of the extraterritoriality doctrine has been lost to *379 time; so too has its meaning. The modern reality is that the States frequently regulate activities that occur entirely within one State but that have effects in many. To take one example, California sets high emission standards for cars sold in its State, a set of regulations that affects automobile prices across the country. See Chamber of Commerce v. EPA, 642 F.3d 192, 197-98 (D.C.Cir.2011). This state law undoubtedly has the “practical effect,” Healy, 491 U.S. at 336, 109 S.Ct. 2491, of impacting car companies located in any State with lower emission standards— which is to say all of them — and thus has extraterritorial effects. Faced with this discrepancy in state emission standards, national car manufacturers have three choices: (1) produce California models and rest-of-country models, spreading the costs of maintaining two separate production and distribution networks across consumers nationwide; (2) sell only California-compliant cars and pass the higher costs of production on to consumers nationwide; or (3) stop selling cars in California entirely, shutting the State off from the stream of commerce and depriving consumers of the economies of scale generated by a national automobile market. All three options practically impact businesses and commerce in other States.
California is not unique, and emission standards are not the only area where this problem arises. Ohio requires state-specific milk labels. Int’l Dairy Foods Ass’n v. Boggs, 622 F.3d 628 (6th Cir.2010). Vermont insists that light bulbs come with labels warning of the dangers of mercury. Nat’l Elec. Mfrs. Ass’n v. Sorrell, 272 F.3d 104 (2d Cir.2001). And many States tax businesses that operate across state lines. See, e.g., MeadWestvaco Corp. ex rel. Mead Corp. v. Ill. Dep’t of Revenue, 553 U.S. 16, 24-25, 128 S.Ct. 1498, 170 L.Ed.2d 404 (2008).
If, in the absence of preemptive federal legislation, these laws and others like them do not violate the extraterritoriality doctrine of Healy, why not? Their effect is no less direct than the Michigan unique-mark requirement we invalidate today. What divides impermissible “direct” extraterritorial laws from permissible “indirect” ones? I cannot tell, and I do not think Healy’s suggestion to look to the “practical effect” of the regulation offers any meaningful guidance. 491 U.S. at 336, 109 S.Ct. 2491.
What’s more, we already have an ineffable test for invalidating some state regulations but not others that affect interstate commerce. State regulations that burden, but that do not facially, discriminate against, interstate commerce must survive Pike balancing, which requires a State to show that the in-state regulatory benefits of a law outweigh the out-of-state burdens the law places on interstate commerce. See Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The inquiry asks courts to balance interests they are ill-equipped to measure, let alone to compare. See Camps New-found/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 619, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Thomas, J., dissenting) (noting that balancing “invites us, if not compels us, to function more as legislators than as judges”); Bendix Autolite Corp. v. Midwesco Enters., Inc., 486 U.S. 888, 897, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) (Scalia, J., concurring) (pointing out that Pike reduces courts to asking “whether a particular line is longer than a particular rock is heavy”).
Why have two tests that suffer from these problems rather than just one? If Pike is problematic for this reason, so too is the extraterritoriality doctrine. The original function of the doctrine no longer exists, and it is exceedingly difficult to understand which extraterritorial effects *380 exceed its bounds and which do not — except. through a “practical effect” inquiry that shares many of the same traits and pitfalls as Pike balancing. For the judge who thinks little of Pike balancing and little of the judicial capacity to weigh apples-and-oranges interests neutrally, it is difficult to see the justification for preserving a “practical effect” extraterritoriality inquiry. And for the judge who wants to preserve Pike balancing, it is difficult to see what additional purpose is served by imposing the extraterritoriality inquiry as well. In the absence of a clear purpose or meaning, extraterritoriality provides a “roving license for federal courts to determine what activities are appropriate for state and' local government to undertake.” United Haulers Ass’n, Inc. v. Oneida-Herkimer Solid Waste Management Auth., 550 U.S. 330, 343, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007).
Eliminating extraterritoriality as a freestanding Commerce Clause prohibition also would not eliminate the role of territory in constitutional law. Territorial limits on lawmaking underlie, indeed animate, many other constitutional imperatives. The most powerful of these, due process, limits a State’s power to extend its law outside its borders. A State must have at least some contact with a defendant to exercise personal jurisdiction, see WorldWide Volkswagen Corp. v. Woodson, 444 U.S. 286, 293-94, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); its courts may not impose punitive damages' that are “grossly excessive” to the State’s interest in the conduct underlying a lawsuit, BMW of N. Am. v. Gore, 517 U.S. 559, 569, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); and it can criminalize only conduct that produces “detrimental effects” within its borders, Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911). Even if Ohio, for instance, made it illegal for its citizens to gamble, the State could not prosecute Nevada casinos for letting Buckeyes play blackjack. See Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 666 (7th Cir.2010).
The Full Faith and Credit Clause underscores a related geographical limitation on the States’ police power. States must respect “public acts which are within the legislative jurisdiction of the enacting State,” but they face no similar imperative for extraterritorial laws. Bradford Elec. Light Co. v. Clapper, 286 U.S. 145, 156, 52 S.Ct. 571, 76 L.Ed. 1026 (1932). The Extradition Clause likewise presupposes territorial lawmaking limits when it speaks of the “State having Jurisdiction of the Crime,” U.S. Const., art. IV § 2, and the Sixth Amendment requires that defendants receive a trial “by an impartial jury of the State and district wherein the crime shall have been committed,” U.S. Const, amend. VI. Indeed, one of the American colonists’ indictments of King George III was that he “combined with others to subject us to a Jurisdiction foreign to our Constitution, and unacknowledged by our Laws.” The Declaration of Independence para. 15 (U.S.1776).
Although extraterritoriality underlies these constitutional imperatives, it carries no freestanding weight outside of them. A law that does not discriminate against interstate commerce, that complies with the traditional requirements of due process and that complies with these other limitations, it seems to me, should not be invalidated solely because of an extraterritorial effect. See, e.g., Alaska Packers Ass’n v. Indus. Accident Comm’n, 294 U.S. 532, 541-12, 55 S.Ct. 518, 79 L.Ed. 1044 (1935).
Eliminating extraterritoriality as a freestanding Commerce Clause prohibition also would not change case outcomes. In Healy, extraterritoriality was an alternative holding. The Court independently held that Connecticut’s law discriminated *381 against brewers who engaged in interstate commerce because “a manufacturer or shipper of beer is free to charge wholesalers within Connecticut whatever price it might choose so long as that manufacturer or shipper does not sell its beer in a border State.” 491 U.S. at 341, 109 S.Ct. 2491. Justice Scalia, indeed, joined the anti-discrimination holding but not the extraterritoriality one, concluding that the Court should have resolved the case solely on the former ground. See id. at 345, 109 S.Ct. 2491 (Scalia, J., concurring). Nor was the extraterritoriality doctrine indispensable to the other cases. The New York price-affirmation law at issue in Bmm-Forman affected only distillers who sold in other States, 476 U.S. at 576, 106 S.Ct. 2080, and the Illinois law in Edgar was a “direct restraint on interstate commerce” that would have “thoroughly stifled” the ability of out-of-state corporations to make tender offers, 457 U.S. at 642, 102 S.Ct. 2629. Even Baldwin, the case sometimes called the father of the modern extraterritoriality doctrine (though it never used the term), dealt with a state law that was the “equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin.” 294 U.S. at 527, 55 S.Ct. 497. All told, I am not aware of a single Supreme Court dormant Commerce Clause holding that relied exclusively on the extraterritoriality doctrine to invalidate a state law.
Nor is there anything special about the Michigan redemption law that ought to make it unconstitutional under the extraterritoriality doctrine but not the traditional dormant Commerce Clause doctrine or some other constitutional guarantee. The law does not discriminate against interstate commerce by favoring in-state bottlers at the expense of out-of-state ones. Even though the unique-mark requirement serves a vital state interest and imposes only a minuscule burden on interstate commerce, its extraterritorial effect appears to doom it. No one, the plaintiffs included, doubts that Michigan may enact a bottle-deposit law under the American Constitution. But extraterritoriality and extraterritoriality alone bars Michigan from the option it believes will best make its bottle-deposit scheme effective.
Michigan, perversely enough, could have chosen to reduce bottle-deposit fraud by enacting regulations far more hurtful to interstate commerce yet not extraterritorial. The State, might have required beverage manufacturers to place a large “Made for Sale in Michigan” label on their products, demanded a burdensome warning label or mandated that manufacturers sell bottles in unusual sizes and shapes that fit only Michigan bottle-redemption machines. So long as those regulations survived Pike balancing, they would be constitutionally permissible. See, e.g., Int’l Dairy, 622 F.3d at 648-49; Sorrell, 272 F.3d at 108-09. Michigan instead chose a nondiscriminatory method premised on compliance in other States, a seeming requirement of any innocuous unique-mark requirement. It is only a non-innocuous unique-mark requirement — the more offensive to the bottler the better — that frees Michigan from having to worry about fraudulent re-demptions arising from non-unique-mark sales in other States. How strange. The Michigan law penalizes manufacturers who bottle soda cans in Ohio and sell them in Ohio but happen to use a Michigan mark. Extraterritoriality- — nominally an offshoot of the Commerce Clause — thus requires courts to strike down a nondiscriminatory state law that affects a purely intrastate transaction. Whatever problem such a law poses, I am hard-pressed to understand why the dormant-dormant Commerce Clause should regulate it.