**PANOMA CORPORATION, a corporation, and D. D. Harrington, Plaintiffs in Error,**

**v.**

**The TEXAS COMPANY, a corporation, Defendant in Error.**

**No. 36111.**

Supreme Court of Oklahoma.

Jan. 7, 1955.

Rehearing Denied May 10, 1955.

Application for Leave to File Second Petition for Rehearing Denied June 14, 1955.

Robinson, Shipp, Robertson & Barnes, by T. Murray Robinson, Oklahoma City, for plaintiffs in error.

Y. A. Land, William E. Lester, Tulsa, Fisher Ames, Oklahoma City, Ames, Daugherty, Bynum & Black, Oklahoma City, of counsel, for defendant in error.

BLACKBIRD, Justice.

Plaintiff in error, Panoma Corporation, is the assignee of the plaintiff in error, D. D. Harrington, and the successor to his

interest in certain oil and gas lease assignments exchanged between Harrington and defendant in error, The Texas Company, pursuant to a very lengthy, involved and comprehensive contract entered into by the latter two parties in 1946. In the interest of brevity, the parties will hereinafter be referred to as "Panoma", "Harrington", and "Texaco".

It was set forth in the contract between Harrington and Texaco that each party owned oil and gas leases in Texas County, Oklahoma, covering specified numbers of acres, ranging upward from 1500, Harrington's being described in the contract's Exhibit B, which leases we now refer to as "Group B", and Texaco's being described in the contract's Exhibit A and C, and now referred to as "Groups A and C". Apparently the contract was entered into with the idea that the mineral deposits lying under the Groups B and C leases were predominantly gas, while the deposits under the Group A leases were predominantly oil; and the parties wanted a mutual arrangement under which Harrington would undertake exploration for and production of gas, while Texaco's activities would be primarily confined to drilling for and producing oil. Accordingly, the contract prescribed an exchange of lease assignments between the parties and by paragraph I thereof Texaco agreed to assign to Harrington the Group A oil and gas leases, Harrington agreed to assign to Texaco the Group B oil and gas leases, and, in turn, Texaco agreed to assign back to Harrington "the gas and gas rights only" in the Group B leases, and, in addition, identical rights in the Group C leases; and the contract thereinafter referred to both of the latter groups merely as: "Texaco Land".

The present controversy concerns only the rights of the parties in regard to the "Texaco Land". Our subsequent discussion of the contract will therefore be limited to the pertinent parts thereof affecting that particular group of leases.

Paragraph II of the contract provided, among other things, that Harrington would pay the delay rentals coming due on the leases covering the so-called "Texaco Land". Paragraph III provided that for the purpose of properly developing and operating these leases for gas in compliance with rules and regulations of the Oklahoma Corporation Commission, Harrington would unitize the gas and gas rights in said land. Paragraph IV contained provisions governing the number and depth of wells Harrington should drill and specified that the development of said land would be subject to the provisions of the contract's Exhibit E, which, among other things, provided that both parties should "have and enjoy * * * the right of ingress and egress" under said leases, and, in substance, conduct their individual activities (Harrington's production of gas and Texaco's production of oil) in such a way as not to interfere with the operations of the other.

Paragraph V provided in part as follows:

"Harrington agrees to pay to Texaco monthly, on or before the 25th day of the month for gas produced and saved from units containing "Texaco land" during the preceding month, an overriding royalty on gas produced and saved from units, which overriding royalty is in addition to the royalties on gas payable to the lessors in the leases covering 'Texaco land'. *Said overriding royalty is hereby reserved and retained by Texaco.* The amount of said overriding royalty shall be determined as hereinafter in this paragraph provided. The overriding royalty above referred to shall, at the option of Texaco exercisable as hereinafter provided, be either:

"(a) 3/8ths of 7/8ths of 4¢ per thousand cubic feet; or

(b) 1/4th of 8/8ths of the weighted average wellhead price per thousand cubic feet paid for gas of similar quality produced in Texas County, Oklahoma, which was in effect during the month in which said overriding royalty accrued.

\* \* \* \* \* \*

"The option hereinabove granted to Texaco shall continue throughout the

life of this contract, and shall be exercisable on or before December 1 of each year. On or before December 1 of each year during the life of this contract, Texaco shall advise Harrington in writing which one of the two overriding royalties specified in sub-paragraph (a) and (b) of this paragraph Texaco elects to receive from Harrington on gas produced and saved from units containing 'Texaco land'. The overriding royalty thus selected by Texaco shall be effective for the next ensuing calendar year. Failure on the part of Texaco to so advise Harrington on or before December 1 of any particular year, shall be deemed to be an election on the part of Texaco to receive during the ensuing calendar year the same overriding royalty which Texaco by previous election had elected to receive during the previous year. Texaco hereby elects, for the remainder of the year 1946, to receive from Harrington the overriding royalty specified in sub-paragraph (a) of this paragraph.

"The overriding royalty payable to Texaco on gas produced and saved from any such particular unit shall be such proportion of the overriding royalty above specified which Texaco may elect to accept as above provided, as the amount of Texaco land located in any particular unit bears to the total acreage in said particular unit.

"It is agreed that Harrington may deliver gas produced and saved from units containing Texaco land to such pipe line or pipe lines as he may choose, and Texaco will by proper division order authorize the purchaser of said gas, in the event the purchaser so elects, to make payments covering Texaco's overriding royalty interest in said gas, to Harrington. In such event Harrington shall remit to Texaco payment for Texaco's overriding royalty within the time specified above.

"In the event the aggregate sum realized by Texaco during the three (3) year period beginning with the date of the delivery of the assignment or assignments to Harrington provided by Paragraph I hereof from the overriding royalty herein specified to be paid to Texaco by Harrington shall be less than $36,400.00, Harrington shall, promptly after the expiration of said three (3) year period pay Texaco in cash the difference between $36,400.00 and the aggregate sum of the overriding royalty payments received by Texaco during said three (3) year period."

Paragraph VI of the contract provided in part as follows:

"Harrington further agrees, without expense to Texaco, as follows:

"(a) To protect 'Texaco land' from the drainage of gas by reason of a well or wells drilled upon the lands adjoining.

"(b) To pay the lessors in the leases covering 'Texaco land', their heirs or assigns, in accordance with the terms of said leases and any amendments thereto, all royalties which may become due upon or for any gas produced from units containing 'Texaco land' by Harrington, Harrington's heirs or assigns.

"(c) To comply with all of the terms, provisions, covenants and conditions of said leases as to 'Texaco land', insofar as said leases cover gas and gas rights in said land.

"(d) To drill all wells which may be drilled on units containing 'Texaco land' with due diligence and in a workmanlike manner; at all times to operate said wells and all appurtenances in connection therewith in an efficient and workmanlike manner and in accordance with good field practice, in order that such wells will currently produce the best possible yield of gas; currently to produce from such wells and deliver to the pipe line to which the well or wells may be connected their maximum output of gas when so efficiently operated, but not to exceed the allowable for such wells according to the current orders, rules and

regulations of the regulatory body or bodies, if any, having jurisdiction governing ·the drilling and operation of such well or wells.

"(e) To · conform to all laws and regulations of the· State of Oklahoma and the United States regarding the drilling or operation of said wells or the operation and development of said leases for gas, and to the rules and regulations of the said regulatory body or bodies, if any, governing the location, drilling, operation, abandonment and/or plugging of wells, and of the control of water and gas, and will furnish Texaco written approval of the said regulatory body or bodies as to the abandonment of said wells or any of them.

\* \* · \* \* \* . \*

"(h) To furnish Texaco, in connection with any gas sold from units containing Texaco land, a correct copy or photostat of each of the following: Monthly statements made to· Harrington by purchaser; charts and meter readings and copies of any and all reports required by the said regulatory body or bodies having jurisdiction, including but not limited to copies of monthly report of wells producing gas.

"(i) To not assign, · either ·in whole or in part, without the written consent of ·Texaco, this restriction to be effective for fifteen (15) years from the date· hereof, provided, however, that this provision and restriction shall not in any manner or way prevent Harrington from mortgaging, or hypothecating Harrington's interest, or any part thereof, in 'Texaco land', or assigning Harrington's portion of the gas produced and to be produced from units containing Texaco land, for the sole purpose of borrowing money to be used exclusively in the payment of the costs of developing or operating said units, or payments for equipment used in. connection therewith, but Harrington shall furnish Texaco with copy of any deed of trust or assignment so executed by Harrington affecting Har-

rington's interest, and any foreclosure by such lender shall not be a violation of the provisions hereof, such consent by Texaco not to be arbitrarily refused if Harrington's proposed . assignee is responsible party or corporation.

"(j) To hold Texaco harmless and protect .it from any and all claims of whatever kind and character growing out of the use, occupation or operation of 'Texaco land'."

Other paragraphs of the contract are as follows:

## "VIII.

"The agreement and undertaking hereof are subject'to valid present and future orders and regulations of duly constituted authorities having jurisdiction.

## "IX.

"To insure the faithful performance by Harrington of this contract and each and every term and provision hereof, Texaco is hereby given a first and prior lien upon any and all tools, machinery, appliances, and appurtenances of every· kind and character whatsoever owned and used by Harrington in producing any well or wells hereunder, or in the operation of the same, and upon any and all gas that may be produced· from such well **or** wells; provided, however, that such lien shall be inferior and subordinate to any deed of trust or lien executed by Harrington mortgaging or hypothecating Harrington's interest, or any part thereof, in said property as provided in sub-paragraph (i) of Paragraph VI hereof.

## "X. ·

"This agreement shall remain .in force for the life of the leases covering 'Texaco land', or any of them, and of any. renewals or. extensions thereof, either by production or otherwise. \* \* \* " (Emphasis added.)

According to the facts stipulated herein the above-quoted contract has been in operation ever since it was entered into in

1946; and, as Texaco is shown by paragraph V of the contract to have done for the year 1946, it has, for every year since this, up to and including 1951, exercised its option to, and has received, its royalty payments under option (a) of said paragraph, i. e., 3/8ths of 7/8ths of 4¢ per thousand cubic feet for each such unit of gas Harrington and/or his successor, Panoma, have produced, thereunder from Texaco land.

On December 9, 1946, the Corporation Commission of this State entered its Order No. 19514, providing in part that effective January 1, 1947 "no natural gas shall be taken out of the producing structures or formations in the Guymon-Hugoton Field in Texas County, Oklahoma, at a price at the wellhead, of less than 7¢ per thousand cubic feet * * *."

After that order had been held constitutional by this court in Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279, affirmed in Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 92 L.Ed. 190, the Texas Company (according to the allegations of its petition herein) made demand upon Harrington and Panoma to pay it the difference between the 4¢ it had received for each thousand cubic feet of gas produced after the effective date of the order and the increased wellhead price of 7¢ per thousand cubic feet fixed for the field by the said order. Apparently Harrington and Panoma refused this demand, and Texaco commenced the present action to require them to account to it for the gas they had produced under the contract since January 1, 1947, at 4¢ per thousand cubic feet, and for judgment for the difference between that amount of gas at that rate per thousand and the same amount at 7¢ per thousand cubic feet.

At the trial by the Court, no testimony was adduced, all of the facts being shown by exhibits and a stipulation between counsel which included an agreement that if plaintiff was entitled to any judgment by reason of the formula prescribed in option (a) of the contract, said judgment should be $102,863.98. It was further stipulated that according to plaintiff's theory, it was entitled to interest on the principal sum at 6% per annum from November 24, 1951, the date when its action was filed, but that according to defendant's theory, it was entitled to interest, if any, only from the date of the judgment.

At the close of the trial, the court entered judgment for plaintiff against Panoma only, in the sum of $102,863.98, with interest only from the date of said judgment. From said judgment, Panoma has appealed. Texaco has filed a cross-appeal on the ground of alleged error in the trial court's refusal to allow interest on the principal recovery for the period between the filing of its action and the date of the judgment.

The first and principal question presented herein is whether or not, by reason of the above-cited Corporation Commission Order No. 19514, plaintiff was entitled, after the effective date thereof, to the fraction specified in the contract's option (a) of 7¢, rather than 4¢, per thousand cubic feet for the gas produced from Texaco land from said date to and including the year 1951. Under plaintiff's theory it is entitled to be paid at the same rate or well-head price for 3/8ths or 7/8ths of each thousand cubic feet produced from said land as specified by the Commission's order for *all* natural gas "taken out of the producing structures or formations in the Guymon-Hugoton Field * * *." Texaco's counsel relies strongly on the opinion of the Circuit Court of Appeals in the case of Phillips Petroleum Co. v. Cabot Carbon Co., 10 Cir., 210 F.2d 841. Panoma has incorporated in its reply brief the Commission's Order No. 28884, entered July 16, 1954, purporting, among other things to clarify its previous order No. 19514, and to show that said previous order was intended only to require *producers* of gas in the field to receive for the gas they produced, the minimum price prescribed in said order, and was not intended to require said producers to pay others, including royalty owners, any sum in excess of that specified in the parties' private contracts. Texaco has filed herein a mo-

tion to strike said order and all reference thereto from Panoma's said brief, and though we have determined that this motion should be and is hereby overruled, we will decide the issue here involved without consideration of said order. Nor, do we attach any particular significance or conclusiveness to the opinion that has been promulgated in the above-cited Phillips case. This is both because a recent order entered in the appeal of that case to the United States Supreme Court, 348 U.S. 867, 75 S.Ct. 105, indicates that said opinion may not be final and because that case may be factually distinguishable from the present one. It is our duty and prerogative to take the lead in construing our own constitution and conservation laws and applying them to the cases before us, and none other.

 The matter at issue here is controlled not by the Commission's Order No. 28884, entered after the present appeal was filed, but in the final analysis, by the constitutional limitations of the Corporation Commission's power. The particular power to which we refer is the police power of the sovereign State of Oklahoma exercised through that agency, as prescribed by our Constitution and Statutes, to conserve the State's natural resources. There can be no question since the Cities Service case, supra, that in order to prevent waste of natural gas and protect correlative rights of owners in a common source of supply of gas, the Commission may fix a uniform price for all gas produced from such common source of supply. However, the limits of the lawful exercise of this power are reached when the Commission sets a minimum price to be obtained for every thousand cubic feet or other similar unit taken out of its natural depository in the ground (or produced) in the field. When this is done, all lawful purposes of this conservation power are served. To gain such end in the interest of the public, interference with private contracts is justified and rests on a firm constitutional basis. In the Cities Service case, supra, as well as Natural Gas Pipe Line Co. v. Corporation Commission, Okl., 272 P.2d 425, this power was allowed to supersede private contract

rights because it was shown to be necessary to the effective exercise of it. In other words, in the situations there presented it was shown and found that the minimum price fixed by the orders involved could not be effectively enforced, and would have nothing like uniform and indiscriminatory operation, unless the price prescribed in the contracts of the parties was superseded. And, in the latter case, the Commission found it necessary in order to obtain such result to prescribe a formula by which the price for which residue gas was sold, could be made the equivalent of the well-head price fixed for raw gas or gas in its natural state. In both of the above cases, cognizance was taken of the direct relation between conservation and profit to the producer; and it was shown that the same field here involved could not be properly developed in accord with a conservatory pattern and conservatory methods without such profit inducement extending to all by a uniform and indiscriminate price. But no such factors to justify interfering with the contract of the parties are shown here. In fact, to burden Panoma with an increased price for the overriding royalty involved and subject it to an extra added premium or deduction for one fractional part of each one thousand cubic feet of gas it produced, in addition to the regular royalty paid when such units of the produce are sold, and to its cost of developing and operating the Texaco land leases, is to diminish or act in derogation of this developer or producer inducement and defeat one of the purposes of the increase in the well-head sale price of gas in the field. In its briefs Texaco stresses the protection of "correlative rights" as one of the purposes of conservation orders and implies that unless the Commission-fixed price is made to supersede the contract price, the price-fixing order will not uniformly and indiscriminately protect such rights. To give this argument the implications and effect intended is to mistake the correct meaning of correlative rights. The term: "correlative rights" is not synonymous with equal rights, and their protection does not mean that the method used to protect them must have an equal effect

on all varying types of rights or ownership. The ownership rights in a common source of supply may arise out of a multitude of various types of conveyances and/or private contracts, prescribing and defining a wide variety of rights with reference to the minerals in such common source of supply, or the proceeds of the production therefrom. As a usual thing, such instruments grant the beneficiary thereof the right to a certain share of the production or its sale price. If such sale price is fixed by the Corporation Commission at a certain figure, then all who have like grants are entitled to like shares of the produce, or its sale proceeds measured by the same price per unit. This applies to the ordinary royalty owner because the instruments executed with reference to his interest provide that his share of the produce will be paid for at the prevailing market price. He is entitled, by private contract or conveyance, to the same price per unit paid other owners of identical interests. But here, Texaco is not an ordinary royalty owner and is the beneficiary of no contract or conveyance (if we confine our consideration to option (a)) which in words or figures entitled it to the same price per unit of produce sold, as such an owner. The only price prescribed in option (a) is 4¢ per thousand cubic feet. No evidence was introduced showing that by this specified price the contracting parties intended the equivalent of the prevailing price in the field. It may be reasonably assumed that if the prevailing or minimum price in effect in the field (whatever that was) at the time the contract was entered into in 1946, had decreased to less than 4¢ per thousand, or had subsequently been so fixed by the Corporation Commission, Texaco would have insisted on continuing to receive, under option (a), a fractional part of 4¢ per thousand for all gas produced by Panoma under the contract, irrespective of the general field price; and we think rightly so. Its rights in the Texaco land are very specifically and extensively set out and defined in the lengthy contract, and that contract must govern them. The trial court erred by its judgment, which in effect, changed and re-wrote the parties' contract for them;

and said judgment should be reversed. This conclusion renders it unnecessary to consider the issue raised by Texaco's cross appeal. Also, nothing herein expressed should be given any significance in the consideration of the contract's option (b), when, as, and if, Texaco chooses to exercise it and it may (or may not) become necessary to construe the contract in the light of its meaning and/or operation.

The judgment of the trial court is reversed and the cause is remanded to said court with directions to set it aside and enter a new judgment denying Texaco, or The Texas Company, any recovery against Panoma Corporation.

JOHNSON, V. C. J., and WELCH, DAVISON, O'NEAL and WILLIAMS, JJ., concur.

CORN, J., dissents.