**Sylvia H. GOLSEN and Zelda F. Brown, Plaintiffs–Appellants,**

v.

**ONG WESTERN, INC., Defendant–Appellee.**

**No. 65833.**

Supreme Court of Oklahoma.

March 15, 1988.

As Corrected March 21, 1988.

Rehearing Denied June 1, 1988.

Harvey L. Harmon, Sr., Julian P. Kornfeld, Kornfeld, Franklin & Phillips, Oklahoma City, for plaintiffs-appellants.

John L. Arrington, Jr., Thomas J. Kirby, David E. Crawford, Jonathan C. Neff, Huffman, Arrington, Kihle, Gaberino & Dunn, Tulsa, Burck Bailey, Harry H. Selph, II, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, for defendant-appellee.

HARGRAVE, Vice Chief Justice.

Appealed here is a judgment in favor of the defendant, ONG Western, Inc., in an action on a contract brought in the District Court of Oklahoma County, Oklahoma by Sylvia H. Golsen and Zelda F. Brown, subnominees, and Constructivist Realty, Inc., plaintiffs.

Appellants-plaintiffs are working interest owners of the Taylor Fox No. I well located in the NE/4 of Sect. 10 T18N, R26W, Ellis County, Oklahoma. In September of 1981 Golsen entered into a gas purchase contract with ONG for a term of fifteen years, requiring the dedication of all the gas from the subject well to the defendant. This contract is referred to in the oil and gas industry as a take-or-pay contract, obligating ONG to take and pay for a minimum amount of gas per year. If that quantity of gas is not taken from the well the defendant covenanted nevertheless to pay for that minimum amount of gas per year (a deficiency payment). Amounts of gas not taken but paid for in any year may be taken from the well free of additional payment at any subsequent time within the fifteen year period. The contract further provides that plaintiffs must repay defendant for all gas paid for but not taken at the time the contact terminates or the gas reserves are depleted. The contract excuses performance under certain circumstances covered by a force majeure clause. This appeal is focused on a portion of that clause which excuses performance during circumstances in which there is a failure of gas supply or market.

In the years 1982, 1983 and 1984 ONG did not take the minimum annual quantities of gas specified by the contract, nor did it pay plaintiffs for the annual minimum quantities. This action was brought to recover the deficiency payments not made and for the diminution in value to the property resulting from the defendant's failure to perform under the contract. On the issue of liability only in the trial court, after waiver of a jury, a general judgment was rendered for the defendant. The trial court's findings of fact and conclusions of law reflect that performance was excused under the force majeure clause of the contract, and there was no tender of gas by the producer in excess of that taken by defendant, therefore the court held for the defendant on the issue of liability and this appeal ensues.

The force majeure clause comprises Article XVII of the contract here considered. This article, in its entirety, reads as follows:

17.1 If either Buyer or Seller is rendered unable, wholly or in part, by force majeure or any other cause of any kind not reasonably within its control, to perform or comply with any obligations or conditions of this contract, such obligations or conditions shall be suspended during the continuance of the inability so caused and such party so rendered unable shall be relieved of liability and shall suffer no prejudice for failure to perform

the same during such period, it being understood that Buyer's minimum annual obligation to take or pay for gas hereunder shall be reduced by the volume which Buyer, under normal circumstances, would have taken from the well during the period of time the inability exists; provided, obligations to make payments then due for gas delivered hereunder shall not be suspended, and in other cases, the cause of suspension (other than strikes, lockouts, or labor disputes) shall be remedied insofar as possible with reasonable dispatch. Settlement of strikes, lockouts, and labor disputes shall be wholly within the discretion of the party having the difficulty. The term "force majeure" shall include, without limitation by the following enumeration, acts of God and of the public enemy, unseasonal weather, freezing of wells of lines of pipe, repairing or altering machinery or lines of pipe, fires, accidents, breakdowns, strikes, labor disputes, and any other industrial, civil or public disturbance, inability to obtain materials, supplies, rights-of-way on customary terms, permits, or labor, any act or omission by parties not controlled by the party having the difficulty, any act or omission (including failure to take gas) of a purchaser of gas from Buyer which is excused by any event or occurrence of the character herein defined as constituting force majeure, failure of gas supply or markets, and any laws, orders, rules, regulations, acts, or restraints of any governmental body or authority, civil or military, or any other causes beyond the control of the parties hereto.

█ Plaintiffs' initial proposition of error urges this Court to ameliorate the presumption of correctness afforded the trial court's findings of fact in instances where the findings are prepared by counsel and adopted by the trial court with minimal changes. In support thereof plaintiffs refer us to *Phillips Petroleum Co. v. United States Fidelity & Guaranty Co.,* 442 P.2d 303 (Okl.1968), stating this Court essentially adopted a lesser standard of review for these instances found in *Kelson v. U.S.,* 503 F.2d 1291 (10th Cir.1974).

*Phillips Petroleum Co. v. United States Fidelity & Guaranty Co., supra,* does not stand as authority for the referred error or the lesser standard of review requested. In *Phillips, supra,* plaintiff contended United States Fidelity & Guaranty had made a contingent promise to pay plaintiff's claim thereby waiving the defense of the statute of limitations. The trial court found no such promise was made and foreclosed the whole issue. As a result of that ruling there was no need to decide whether plaintiff placed reliance upon the promise. On appeal it was held the facts of the cause supported an adjudication of implied waiver. The Court remanded the cause for new trial stating that reliance upon the promise of the defendant has not yet been ascertained or considered by the trial court and that question was potentially a determinative issue in the action.

█ Appellants recognize the case of *Tiger v. Lozier,* 124 Okl. 260, 256 P. 727 (1927) is contrary to this position they now assert. There the Court's syllabus states where the court adopts the findings of fact and conclusions of law submitted by counsel and those findings are reasonably supported by the evidence and the conclusions of law therein are correctly stated the fact that the findings were tendered by counsel prior to their adoption by the court does not constitute error. We have considered appellants' objection to this practice but refuse to label the questioned practice reversible error. It is the duty of the trial court to make findings of fact and conclusions of law upon request. That duty requires the court to examine proposed findings using its independent judgment of the facts and applicable law with a view to adopting only those findings and conclusions justified in the cause being considered. Once approved and adopted they became the findings and conclusions of the court.

In the trial court's findings of fact and conclusions of law, the basis of the trial court's judgment for the defendant is set out. There the court determined a decline in demand triggered the force majeure

clause. Additionally the court found that amounts of gas in excess of that actually taken were not tendered under the contract provisions in the light of the conservation law of Oklahoma.

██ The trial court found that beginning in 1982 ONG experienced a loss of market so severe it constituted a failure of market condition. This finding states defendant's gas sales decreased from 363 billion cubic feet in 1981 to 267 billion cubic feet in 1983. This is a 26.4% reduction in two years or a 13.2% reduction per year. (The delivery quantities are expressed per accounting year in the gas purchase contract.) Plaintiffs' exhibit 24 also reflected over the same period gas sales revenue decreased from $965,889,000 to $919,298,000. In the conclusions of law the trial court held that this decrease in demand, now termed failure of market was a force majeure event. The court also concluded that this event excused and suspended ONG's obligation under the contract to either take or pay for the gas from the Fox well.

The trial court also concluded that production from the well, which is taken here to mean gas produced from the Fox well and purchased from plaintiffs, in excess of the volume that was actually taken would have been in excess of market demand, would have been legally prohibited waste under 52 O.S.1981 § 86.3 and § 239. The court concluded that under the provisions of the contract there was no tender of gas over that in fact taken and therefore no obligation to pay for the gas not taken under the take-or-pay provisions of the contract.

The trial court therefore found for the defendant on two grounds, each sufficient to defeat plaintiffs' prayer for recovery. The first ground is that under the provisions of the force majeure clause, diminution in demand excuses both the obligation to take gas and the obligation to pay for gas not taken. Secondly, the trial court held that no gas other than that taken was tendered under the provisions of the contract and no obligation existed to pay for gas neither actually taken nor tendered.

The trial court held that the failure of market situation triggering the force majeure clause was a result of a decline in market demand and the inability to sell Golsen's gas at a profit. Although it is widely accepted that a reduction in demand for a product results in a decrease of the market price for it, and the second phenomenon is a result of the first, the trial court held both circumstances were force majeure events.

This second consideration, inability to sell gas at a profit, is not in the contemplation of the law a force majeure event. In *Morrison v. W.L. Green Commission Co.*, 61 Okl. 287, 161 P. 218 (1916), this Court held in the second court syllabus that testimony on behalf of a defendant in a breach of contract suit was properly excludable which does not tend to show either a right to rescind or impossibility of performance but merely tends to show performance was more difficult or expensive than at the time the contract was entered into. The policy of the law in this state is reflected in the sales article of the Uniform Commercial Code. Therein damages for breach of contract are specified around the general principle of the difference between the contract price and market price. In regard to seller's damages see for example 12A O.S.1981 § 2–706(1) and § 2–708(1). Section 2–708(1) which states:

Subject to subsection (2) and to the provisions of this article with respect to proof of market price (Section 2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

After resale of the contracted goods the seller may recover the difference between the resale price and the contract price together with incidental damages. 12A O.S. 1981 § 2–706(1).[1]

---

1. Buyer's damages are similarly grounded. See 12A O.S.1981 § 2–712(2) and § 2–713(1).

Additionally, both the Oklahoma and Official Code Comments to 12A O.S.1981 § 2–615 give explicit denial to the excuse of performance by failure of presupposed condition where performance becomes more expensive. Official Code Comment four to the section states: "Increased cost alone does not excuse performance unless the rise in cost is is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices intended to cover...." *See also*, Restatement of Contracts § 455.

We therefore find that the fact that no market exists (during a relevant period of time) for gas at or above ONG's contract price does not establish failure of markets.

Insofar as the trial court held that the term "failure of markets" in this contract refers to a decline in demand of the product, the trial court also erred. 15 O.S.1981 § 157 provides that the whole of a contract is to be construed together if reasonably practicable so that each clause is an aid to interpreting the others. Additionally, contracts should be construed so that any repugnancy in a contract is reconciled if possible, by such an interpretation as will give some effect to the repugnant clause which is subordinate to the general intent and purposes of the whole contract. 15 O.S. 1981 § 168. This gas sales contract consists of approximately thirty pages. Throughout the document the general purpose or intent is to arrange the purchase and sale of gas. These provisions give the defendant an exclusive right to take plaintiffs' gas for a term of years at a set price. The defendant acquires a contractually-assured supply while the plaintiffs are assured a market; both parties doing so at a price which is an agreed part of the bargain. Secondly, the plaintiffs relinquish their right to sell gas to third parties and the plaintiffs in return are paid for a minimum annual quantity of gas whether or not taken in that year. The parties are

assuring themselves of the ability to purchase and sell for a term of years at a bargained-for price. The take-or-pay provision permeates the entire contract.

The force majeure clause as interpreted by the defendant is repugnant to this general purpose. Defendant urges that the inclusion in the force majeure clause of the phrase "failure of gas supply or markets" should be read with the language in the first line of the clause "in whole or in part" so that the language would relieve it of the obligation to take at all, or to pay if not taken, where there is a decline in demand. Such an interpretation frustrates the basic premises of the contract virtually entirely. It would eliminate the requirement to pay for gas not taken as a practical matter, for any contract amount not taken would be the result of a partial failure of demand.[2]

This contract contains provisions for price redetermination upon the happening of certain events. Article Fifteen contains the following price guidelines. First, the price is stated to be the maximum allowable under the Natural Gas Policy Act of 1978, but no more than the price of gas under § 102 of that Act. Second, if the well qualifies as a stripper well or a well entitled to a higher price by virtue of production costs, the contract gives the buyer the right to pay that price or release the well unless a mutually agreeable price is arrived at. Third, the contract provides for price redetermination in the event gas prices cease to be regulated by the Federal Energy Regulatory Commission or other governmental authority on the first July after deregulation. The price is then determined by the average three highest prices being paid in the preceding month for gas in Dewey, Ellis or Woodward County after deregulation. After this determination, if ONG determines this price to be unacceptable, it has the absolute right to designate an alternative price which the seller-plaintiff must accept or terminate the contract as to that portion of the contract gas. Fourth, the contract provides that if the

2. As noted, price and demand are inextricably interrelated when dealing with a fungible item such as gas. The lack of *market demand* as distinguished from absolute demand is a function of price, although the trial court treated these items separately.

Corporation Commission or any other governmental action prohibits ONG from passing through the full price it pays for the gas to its customers, the price ONG pays for seller's gas may be limited to the pass through price and, upon that event, seller may terminate. These price redetermination provisions occupy five legal pages. To allow force majeure to excuse performance under the contract clause containing the phrase "failure of markets" is to ignore these long and detailed arrangements as well as the extensive take-or-pay provision in favor of an interpretation of a short phrase in a contractual provision broadly denoting supervening impossibility. Such a construction allows three isolated words to alter the entire character of a lengthy and detailed contract which provides for the exact situation here encountered in this cause and that is the deregulation of gas price. To allow this phrase to negate the lengthy major provisions of the contract places undue influence on a tenuous construction of two extracted portions of the force majeure clause. By statute in Oklahoma, particular clauses of a contract are subordinate to its general intent. 15 O.S. 1981 § 166. The mutual intent of the contracting parties should be arrived at by examination of the language of the entire contract. A particular clause will not control if it is violative of the parties' general intent even though persuasive in isolation. *U.S. for the Use of Bachman & Keffer Construction Co. v. H.G. Cozad Co.*, 324 F.2d 617 (10th Cir.1964). Suspension of the obligation to take or pay for gas in the event of a partial failure of the market is contrary to the general purpose of the contract, and indeed, applying the phrase literally would transform the contract to another creature entirely. To do so would not accord with the statutory authority last mentioned or 15 O.S.1981 § 168. In *Paclawski v. Bristol Laboratories, Inc.*, 425 P.2d 452 (Okl.1967), this Court refused to apply an artificial rule that a prior clause governs over a later inconsistent one, in view of the provisions of 15 O.S.1981 §§ 166 and 168 so that a clause consistent

to the general purpose and intent of the contract will be given full effect and a clause repugnant thereto will be qualified as necessary.

The trial court also held that the conservation laws of the state of Oklahoma relieved ONG from paying for any gas not taken during the time frame here considered. In its findings of facts and conclusions of law the trial court found that production in excess of market demand constitutes waste under 52 O.S.1981 §§ 239 and 86.3. Production from the Fox Well in excess of the amount actually taken by ONG would have constituted waste. Inasmuch as producers are statutorily enjoined from committing waste, the producer-plaintiffs could not have tendered more gas than was actually taken from the well. Under the contract, there is no obligation to pay for gas which is not tendered. The conservation laws of this state, however, do not prohibit payment for gas not presently taken, for gas not taken is not produced and does not constitute waste as a matter of law.

The contract contains the definition of tender. Article 1.5 states: *"Tendered as used herein with respect to volume of gas, shall mean Seller's making available to Buyer volumes of gas which are deliverable and legally producible from wells covered hereunder".*

The contract the plaintiff is trying to enforce provides, by the defendant's admission, for a gas purchase price greater than the current market price. ONG is asserting that gas not taken was not legally producible by virtue of the strictures of Oklahoma's natural gas conservation statutes and rules of the Commission adopted in furtherance thereof. Title 52 O.S.1981 § 239 provides that a person having a right to drill and produce from a common source may take therefrom only such proportion of the natural gas as may be marketed without waste, whenever the full production from that common source is in excess of market demands.[3] The inquiry here is

---

**3.** "Whenever the full production from any common source of supply of natural gas in this state

is in excess of the market demands, then any person, firm or corporation, having the right to

whether the owner of the right to produce is prohibited by this statute from tendering the contract gas. The statute is directed to owners of a right to drill and produce, here plaintiffs. In accordance with the trial court's findings of fact we assume the statutory condition precedent is fulfilled, so that full production from the common source is in excess of demand.[4] Then the owner of the right to drill and produce may only take that proportion of gas that may be marketed without waste. The remainder of the statute allocates production among owners of a common source and between common sources.

We have said that waste in this sense may amount to physical waste or economic waste. The question of physical waste is not presented by the facts of this case inasmuch as plaintiffs do not seek to enforce the take provision of the contract. The contract does provide for specific performance but the defendant is requested to only perform the alternative which is making advance payment for minimum quantities of gas not taken. Physical waste is therefore not a factor in this cause. There remains economic waste. In regard to ability to tender gas the question is posed: Is economic waste created by the enforcement of this provision of the contract? The statute provides that the producer-plaintiffs may only produce the amount which they can market without waste. The statute does not speak further down the market line than the point at which the producer markets his product. The statute does not

concern itself with the possibility of economic waste at some further point in the marketing journey that culminates in consumption of the product but deals with waste on the part of the owner of a right to drill and produce.

Here the owner of the right to produce is the plaintiff. The plaintiffs are asking the Court to enforce the contract between them and the defendant. The contract provides for the sale of gas at a premium. Economic waste is not established by showing the owner of a right to drill has a contract to sell gas for more money than it is currently bringing in the market. It may be that a purchaser is committing waste when he buys a one dollar item for two dollars, but one cannot opine that a person that sells a one dollar item for two has committed waste. Section 239 statutorily enjoins producer-sellers from committing waste—not purchasers.

The trial court held also that production in excess of market demand was waste under the definition of that term in 52 O.S.1981 § 86.3, and that the statutory prohibition against production of gas so to constitute waste contained in that statute combine to prohibit plaintiffs' tender of any more gas than was actually taken. Section 86.3 provides the term waste shall include waste incident to the production of natural gas in excess of transportation and marketing facilities or reasonable market demand.[5] Here the statute again focuses on

drill into and produce gas from any such source of supply, may take therefrom only such proportion of the natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by any such person, firm or corporation bears of the total natural flow of such common source of supply having due regard to the acreage drained by each well, so as to prevent any such person, firm or corporation securing any unfair proportion of the gas therefrom; provided, that the Corporation Commission may by proper order, permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The said Commission is authorized and directed to prescribe rules and regulations for the determination of the natural flow of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect

the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another."

4. The trial court did not find, however, that full production from this common source was in excess of market demands, but only that available production was in excess of demand generally.

5. "The term 'waste', as applied to gas, in addition to its ordinary meaning, shall include the inefficient or wasteful utilization of gas in the operation of oil wells drilled to and producing from a common source of supply, the inefficient or wasteful utilization of gas from gas wells drilled to and producing from a common source of supply; the production of gas in such quanti-

production. The statute is not directed to payment for gas not taken, but to waste incident to production in excess of reasonable market demand. In this situation the plaintiff-producer has a market for his gas and is, indeed, seeking to enforce that market through the courts. The producer's contract is proof that he has a market and it is that market he is trying to enforce here.

The trial court found there was no market demand for natural gas at the contract price of 4.50 per MMBtu in finding of fact number 14 and conclusion of law number 6. It is this preliminary finding that is utilized to invoke the waste defense urged under 52 O.S.1981 §§ 86.3 and 239. Since production in excess of market demand is prohibited the court found that plaintiffs' gas was not legally producible, was not tendered and thus the take-or-pay provision did not operate on gas quantities in excess of that actually taken. There are two fallacies to this argument. First, the producer-plaintiffs have a market contract for the high-priced gas, and thus the finding as between the litigants before the court is erroneous under the undisputed facts of this action. Second, the conservation statutes of this state are designed to thwart sales of gas at sacrifice prices which would otherwise result in an insufficient return for the dissipation of a state resource. To allow the defendant to argue there is no market for this high-priced gas and set up this lack of demand as a defense in an action to enforce a purchase contract for that high priced gas is an ultimately circular argument which ignores the basis of this lawsuit—an action to enforce a purchase contract for the high priced gas for which it is alleged there is no demand.

█ The conservation laws of this state are set up to encourage the sale of gas at a price which is not arbitrarily low, and are not designed to inhibit the sale of gas at higher than market prices. In referring to 52 O.S.1941 § 239 (now 52 O.S.1981 § 239) in *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 203 Okl. 35, 220 P.2d 279 (1950), affirmed, *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 71 S.Ct. 215, 92 L.Ed. 190, this Court discussed the general purposes served by the statute. There the Court noted, as noted above, that the statute's reference to protection of the interest of all those having a right to produce gas from a common source of supply directs attention to the owners of the land overlying the gas and such interests they have conveyed. The statute's concern is the receipt of adequate compensation by these owners for the severance of their minerals as shown by this language from *Cities Service Gas Co. v. Peerless Oil & Gas Co., supra,* beginning 220 P.2d at p. 287:

> It is readily conceivable that in the course of development of a particular gas field, the ownership of producing and marketing facilities might become such, or be so combined, as to permit monopolistic practices. Under the circumstances prices for gas might be established having no relation to the market value of

ties or in such manner as unreasonably to reduce reservoir pressure or unreasonably to diminish the quantity of oil or gas that might be recovered from a common source of supply, the escape, directly or indirectly, of gas from oil wells producing from a common source of supply into the open air in excess of the amount necessary in the efficient drilling, completion or operation thereof; waste incident to the production of natural gas in excess of transportation and marketing facilities or reasonable market demand; the escape, blowing or releasing, directly or indirectly, into the open air, of gas from wells productive of gas only, drilled into any common source of supply, save only such as is necessary in the efficient drilling and completion thereof; and the unnecessary depletion or inefficient utilization of gas energy contained

in a common source of supply. In order to prevent the waste or to reduce the dissipation of gas energy contained in a common source of supply, in addition to its other powers in respect thereof, the *Commission shall have the authority to limit* the production of gas from wells producing gas only to a percentage of the capacity of such wells to produce. The production of gas in the State of Oklahoma in such manner and under such conditions as to constitute waste as in this act (footnote reference omitted) defined is hereby prohibited, and the Commission shall have authority and is charged with the duty to make rules, regulations, and orders for the prevention of such waste and for the protection of all freshwater strata and oil- or gas-bearing strata encountered in any well drilled for gas."

gas prevailing throughout the natural gas industry, and in other fields of commensurate development costs, and having *no relation to the market value of* other natural resources and products in competitive usage. On the other hand, a like result might obtain from economic warfare between competing producers and marketers. Under either of such circumstances *prices might be so reduced that landowners* or royalty holders or particular leasholders *would have their interests* in the gas exhausted, dissipated and taken, *without having received any reasonable compensation, and each suffer waste of a valuable reversion.*

Likewise the taking of gas under such circumstances would be inimical to the public interest. Like other natural resource, the subject of private ownership and exploitation, natural gas is a taxable resource. The tax is applied to the gross production and finally measured by the market value or price of the thing produced or reduced to personal possession. *The taking of gas* from a field, *when the taking price of the gas is substantially lower than the price prevailing in other gas fields* having commensurate production costs, and at prices having no relation to the market value of other of the natural resources of competitive usage, *leads to an exhaustion of such gas without it having borne its fair share of taxation.*

Natural gas being exhaustible and of various valuable usage, the public interest extends to its conservation. Undoubtedly the price at which gas may be obtained has an influence upon the ultimate purpose for which gas may be taken and used, and *when the price for gas is substantially lower than its intrinsic value* or lower than the market price of products of similar usage, *a wasteful use of the gas is apt to occur.*

* * * * * *

We are of the opinion that such considerations as above discussed occupied the legislative mind and motivated the enactment of the 1915 Act. In the 1915 Act

the grant of power to the Corporation Commission to regulate the taking of natural gas from any source of supply, so as to protect the interest of all those having a right to produce therefrom, by necessary implication, includes the power to fix a minimum price on the gas as a condition of the taking, when found reasonably necessary to the accomplishment of that purpose.... (emphasis added)

This analysis of § 239 of 52 O.S. is confirmed in *Panoma Corp. v. The Texas Company, Inc.*, 284 P.2d 716 (1955). There the Court was asked to pass through the benefits of a Corporation Commission minimum price order to the assignors of a lease, where the assignor had reserved an override as consideration for transfer of a lease of ⅜ of ⅞ of 4¢ per 1000 cubic feet. It was argued that the order specifying 7¢ per 1000 cubic feet replaced the 4¢ figure in the contract. The effect of the request was to increase the cost to the producer of severance of the gas. In answering this the Court stated, at p. 722:

The matter at issue here is controlled ... by the constitutional limitations of the Corporation Commission's power. The particular power to which we refer is the police power of the sovereign State of Oklahoma exercised through that agency, as prescribed by our Constitution and Statutes, to conserve the State's natural resources. There can be no question since the Cities Service case, supra, that in order to prevent waste of natural gas and protect correlative rights of owners in a common source of supply of gas, the Commission may fix a uniform price for all gas produced from such common source of supply. However, *the limits of the lawful exercise of this power are reached when the Commission sets a minimum price to be obtained* for every thousand cubic feet or other similar unit taken out of its natural depository in the ground (or produced) in the field. *When this is done, all lawful purposes of this conservation power are served....* (emphasis added)

The core intent of § 239 was again described as regulating the taking of gas from the producing formation in such a

way as to prevent waste and protect correlative rights by assuring the product brings a fair and adequate return in *Cabot Carbon Co. v. Phillips Petroleum Co.*, 287 P.2d 675 at pp. 678–679 (Okl.1955):

> ... When it is recognized that the power of the State and its instrumentality, the Corporation Commission, extends only to the taking from the natural reservoir (which diminishes the State's natural resources reserves) it is readily understood that the expression "correlative rights" or that agency's power to protect them, also extends only that far. In other words, the Commission can protect the individual owner to the extent of seeing that he gets the share of the common reservoir's produce to which he is entitled by his grant, contract or conveyance. It can see that he has a co-equal opportunity with all other owners to reduce his share to possession, but, as we pointed out in the Panoma Co. v. Texas Co., Case, supra, this does not mean that his share will be equal to that of other owners having a co-equal *right to participate* in the common reservoir, or that he will get the same price for his share that the others obtain. The price per unit he obtains for his share of the product, like his interest, or the quantum of his share in said production, may be limited, restricted or fixed by private contract; ... The Corporation Commission's power to regulate the taking from the reservoir to prevent waste and protect correlative rights, even to the extent of fixing the price of produce so taken, if necessary to accomplish these conservation purposes, does not extend to overturning private contracts where not necessary for such accomplishment. Again, as we pointed out in the Panoma–Texas Co., case, supra, *the only extent to which the Commission's price-fixing power has yet been justified in any of the afore-cited price-fixing cases is to see that all gas produced and marketed from the Guymon–Hugoton reservoir brings a uniform minimum price....* (emphasis added)

In its findings of fact and conclusions of law the trial court also stated that 52 O.S. 1981 § 240 placed a duty upon the producer to restrict production to market demand, and this authority in conjunction with § 239 of the same title rendered it legally impossible for the producer to tender the additional amount for which recovery is sought under the take-or-pay provisions of the contract. However, the express terms of the statute, 52 O.S.1981 § 240,[6] are directed to those parties fitting the description of common purchaser. The broad thrust of the statute is to require a purchaser (not producer) to purchase natural gas available to its gathering lines without discrimination in favor of one producer or common source of supply to the detriment of others. The statute enjoins discriminatory purchases by a common purchaser and does not command or prohibit any action by a producer. The statute is simply not germane to the issue considered here: Could the producer tender gas under the contract which provides that tender of gas requires the gas to be legally producible? Any inhibition im-

---

**6.** Every person, firm or corporation, now or hereafter engaged in the business of purchasing and selling natural gas in this state, shall be a common purchaser thereof, and shall purchase all of the natural gas which may be offered for sale, and which may reasonably be reached by its trunk lines, or gathering lines without discrimination in favor of one producer as against another, or in favor of any one source of supply as against another save as authorized by the Corporation Commission after due notice and hearing; but if any such person, firm or corporation, shall be unable to purchase all the gas so offered, then it shall purchase natural gas from each producer ratably. It shall be unlawful for any such common purchaser to discriminate between like grades and pressures of natural gas, or in favor of its own production, or of production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the natural gas to be marketed, such production shall be treated in like manner as that of any other producer or person, and shall be taken only in the ratable proportions that such production bears to the total production available for marketing. The Corporation Commission shall have authority to make regulations for the delivery, metering and equitable purchasing and taking of all such gas and shall have authority to relieve any such common purchaser, after due notice and hearing from the duty of purchasing gas of an inferior quality or grade.

posed by this statute is imposed on the purchaser, and as such, does not affect the producer's ability to tender gas so as to invoke the take-or-pay provision.

Corporation Commission Rule 1–305 [7] is also set up as an impediment to the producer's ability to tender gas in order to invoke the take-or-pay provision of the contract. This Commission rule at the outset refers to the statute last discussed, 52 O.S.1981 § 240, and follows its format in that it is directed to the purchaser, not producer of gas. In that event, the strictures of the rule do not affect the producer's ability to tender gas, for it in no way speaks to a producer's ability to take gas from the formation. Indeed the rule speaks directly to the purchaser's duty to take and not the ability of the producer to deliver. The rule states that in the interest of the prevention of waste and protection of correlative rights the following priority schedule shall be implemented *by any first purchaser* of gas, and contains four well priority classes, Rule 1–305(b). Section (c) then explicitly states that it operates to schedule takes from production the purchaser is already required to take, contemplating a contractual duty to purchase. Section (c) also provides takes from lower priority wells is to cease before the next higher is curtailed, and demand for part of the gas in a priority of class shall be ratable. Section (e) provides for the duties of multiple purchasers. Section (f) provides a procedure for determination of compliance to the rule so as to

7. RULE 1–305. PRIORITY SCHEDULE FOR SUPPLY AND DEMAND IMBALANCE

(a) Any common purchaser as defined in 52 O.S.1981, Section 240, shall purchase all the gas which may be offered for sale, and which may reasonably be reached by its trunk lines or gathering lines, without discrimination in favor of one producer as against another or in favor of any one source of supply as against another, except as authorized by the Commission under (b) below.

(b) In the interest of the prevention of waste and protection of correlative rights, the following priority schedule shall be implemented by any first purchaser of gas whenever the permitted production for all wells in any common source of supply in its system in this state, including gas which is processed, is in excess of that purchaser's reasonable market demand; provided, however, if the first purchaser does not contractually control wellhead production, then the first taker of gas shall be responsible for implementation of the following priority schedule.

(i) Priority One—Hardship and distressed wells.

(ii) Priority Two—Enhanced recovery wells.

(iii) Priority Three—Wells producing casinghead gas and associated gas.

(iv) Priority Four—If after the first purchaser or first taker has taken the gas from Priorities One through Three and still has further market demand in its system for gas, said purchaser or taker shall take ratably from all allocated, special allocated and unallocated common sources of supply which may be offered for sale, and which may reasonably be reached by its trunk lines or gathering lines, without discrimination in favor of one producer as against another or in favor of any one source of supply as against another.

(c) When permitted production of gas from all wells from which a purchaser or taker is required to take exceeds the market demand of said purchaser or taker, all reductions in gas purchases or takes from wells in each Priority shall be ratable. All production from the lower priority wells shall be shut-in before production from any well in the next higher priority is curtailed.

(d) Any well which meets the definition of more than one priority shall be assigned the higher priority.

(e) When there is more than one purchaser or taker involved in the taking of gas from a well into any purchaser's system, all purchasers and takers within that system shall be responsible for compliance with this Rule.

(f) Upon a verified application of the Director of the Oil and Gas Conservation Division, or any other person, the Commission, after notice and hearing, may determine if gas has been ratably purchased or taken from a common source of supply on a systemwide basis in accordance with this rule without avoidable waste and with equitable participation in production and markets by all operators and other interested parties.

(g) In any month wherein a purchaser or taker has a market demand/supply imbalance and must curtail purchases or takes in compliance with this Rule, Form 1004 B shall be filed by said purchaser or taker with the Oil and Gas Conservation Division.

(h) Any interested party may file an application requesting that the Commission, for good cause shown, authorize limited deviation from the general priority schedule provided under (b) above. The Commission on its motion may initiate a review of the continued need for such a limited deviation. After notice and hearing, the Commission may authorize limited deviation upon finding that the same is necessary in order to prevent waste, protect correlative rights, or is otherwise required by the public interest or authorized by law.

afford equitable participation in market and production by producers. In short the duties found in the rule are placed on common purchasers, do not prohibit tender by the operator, and indeed operate on the premises that a purchaser is obligated to take more than the market demands.

The trial court erred in holding that there was no liability on the defendant's part to pay for gas not taken. The force majeure clause of the contract does not suspend ONG Western's obligation to either take gas and pay for that taken or to pay for a minimum amount of gas not taken. Additionally, neither the conservation laws of this state nor administrative rules of the Corporation Commission prohibit this producer from tendering the contract quantities of gas at issue here. Accordingly, the judgment of the trial court for the defendant denying liability to the plaintiffs is reversed and the cause is remanded for further proceedings to determine plaintiffs' damages.

REVERSED AND REMANDED WITH DIRECTIONS.

DOOLIN, C.J., LAVENDER, SIMMS, ALMA WILSON and KAUGER, JJ., and STUBBLEFIELD, Special Justice, concur.

OPALA, J., concurs in result.

SUMMERS, J., concurs in part and dissents in part.

HODGES, J., disqualified.
(STUBBLEFIELD, Special Justice, appointed in place of HODGES, J.)

KAUGER, Justice, with whom OPALA, Justice, joins concurring:

I agree that no relief should be granted here. However, I believe that a fuller discussion of the Uniform Commercial Code, 12A O.S.1981 § 2–615,[1] than that provided by the majority opinion, is warranted. Although the Court recognized the applicability of the Uniform Commercial Code (UCC) to the facts presented, it curtailed its discussion of commercial impracticability, a defense fairly comprised by the pleadings and the trial court's findings of fact and conclusions of law.[2]

A basic tenet of commercial law, now codified in § 2–615 of the Uniform Commercial Code (UCC), is that a party's duty to perform pursuant to a contract for the sale of goods may be excused on the basis of commercial impracticability.[3] A contract for delivery of natural gas is recognized as a sale of goods under the UCC.[4] Title 12A O.S.1981, § 2–615(a)[5] provides that nonperformance of a contract will not constitute a breach where the seller has not assumed a greater obligation by the terms of the contract where "performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on

1. Title 12A O.S.1981 § 2–615 provides:
"(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
(b) Where the clauses mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He

may so allocate in any manner which is fair and reasonable.
(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

2. Although both the parties and the trial court referred to a "failure of markets" rather than to impracticability, as such, both the facts and the argument of counsel adequately present the defense.

3. *Asphalt Int'l, Inc. v. Enterprise Shipping Corp.,* 667 F.2d 261, 265–66 (2nd Cir.1981).

4. *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769, 778–79 (Colo.1985).

5. Title 12A O.S.1981 § 2–615, see supra note 1.

which the contract was made ...".[6] As drafted, the statute appears to apply only to sellers; nevertheless, both the Official Code Comments[7] and a number of courts have recognized the section as equally applicable to buyers if a purchaser satisfies all elements of the defense.[8]

The UCC appears to impose only two requirements to invoke this defense: (1) that the party asserting the defense through the terms of the contract not assume a greater obligation than is ordinary; and (2) that the performance not be made impracticable by the occurrence of a condition which alters a basic assumption upon which the contract is founded. A third element, judicially recognized as necessary to justify relief, involves the necessity that the occurrence making performance impracticable be unforeseeable.[9]

Despite the fact that a cursory reading of the cases indicates that the doctrine should be expanded to situations where costs of performance have increased dramatically,[10] the requirement of nonforseeability has severely limited the application of the doctrine.[11] While the addition of this

element might not seem onerous, it has been applied in such a way as to make the occurrence or nonoccurrence of virtually any condition, from wartime regulations[12] to economic depression in the agricultural economy,[13] foreseeable. It has been recognized, however, that a requirement of absolute nonforseeability is so logically inconsistent with the defense that the application of such a standard would nullify the doctrine.[14]

Courts have seldom allowed relief from contractual obligations on the basis of impracticability.[15] However, many jurisdictions have been willing to at least pay lip service to a formulation of the doctrine which would not require absolute impossibility of performance[16] before applying the defense but rather would excuse performance where it would require unreasonable difficulty, expense, injury or loss,[17] or where failure to allow the defense would result in grave injustice.[18] In order to meet the requirement of unreasonable expense a mere showing of loss under the contract is insufficient. To qualify, the

6. Title 12A O.S.1981 § 2–615, see supra note 1.

7. U.C.C. § 2–615, Uniform Commercial Code Comment 9.

8. *Lawrence v. Elmore Bean Warehouse, Inc.,* 108 Idaho 892, 702 P.2d 930–32 (1985); *Nora Springs Coop. Co. v. Brandau,* 247 N.W.2d 744, 747–489 (Iowa 1976); *N. Illinois Gas Co. v. Energy Coop., Inc.,* 122 Ill.App.3d 940, 78 Ill.Dec. 215, 226, 461 N.E.2d 1049, 1060 (1984).

9. *N. Illinois Gas Co. v. Energy Coop., Inc.,* see supra note 8, 78 Ill.Dec. at 223, 461 N.E.2d at 1059; *Portland Section of the Council of Jewish Women v. Sisters of Charity of Providence In Oregon,* 266 Or. 448, 513 P.2d 1183, 1188 (1973); *Liner v. Armstrong Homes of Bremerton, Inc.,* 19 Wash.App. 921, 579 P.2d 367, 371 (1978).

10. ONG alleges a 30.5% drop in sales since the time the contract was executed.

11. *Portland Section of the Council of Jewish Women v. Sisters of Charity of Providence In Oregon,* see supra note 9; *N. Illinois Gas Co. v. Energy Coop., Inc.,* see supra note 8, 78 Ill.Dec. at 224, 461 N.E.2d at 1059; *Liner v. Armstrong Homes of Bremerton, Inc.,* see supra note 9.

12. *Berline v. Waldschmidt,* 159 Kan. 585, 156 P.2d 865, 868–69 (1945).

13. *Groseth Int'l, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159, 167 (S.D.1987).

14. *Opera Co. of Boston, Inc. v. Wolf Trap Found. for the Performing Arts,* 817 F.2d 1094, 1100–01 (4th Cir.1987).

15. *McGinnis v. Cayton,* 312 S.E.2d 765, 775 (W.Va.1984) (Harshbarger, J. concurring).

16. *Groseth Int'l, Inc. v. Tenneco, Inc.,* see supra note 13 at 165; *N. Corp. v. Chugach Elec. Assoc.,* 518 P.2d 76, 81–82 (Alaska 1974); *Garner v. Ellingson,* 18 Ariz.App. 181, 501 P.2d 22–23 (1972).

17. *Groseth Int'l, Inc. v. Tenneco, Inc.,* see supra note 13 at 165; *Metropolitan Park Dist. of Tacoma v. Griffith,* 106 Wash.2d 425, 723 P.2d 1093, 1102 (1986); *Murray E. Geldersleeve Logging Co. v. N. Timber Corp.,* 670 P.2d 372, 375 (Alaska 1983); *Portland Section of the Council of Jewish Women v. Sisters of Charity of Providence,* see supra note 9, 513 P.2d at 1188; *Thornton v. Interstate Sec. Co.,* 35 Wash.App. 19, 666 P.2d 370, 377 (1983); *Liner v. Armstrong Homes of Bremerton, Inc.,* see supra note 9, 579 P.2d at 370; *Garner v. Ellingson,* see supra note 16, 501 P.2d at 23.

18. *N. Illinois Gas Co. v. Energy Coop., Inc.,* see supra note 8, 78 Ill.Dec. 224, 461 N.E.2d at 1061.

applicant must show extreme, not merely unreasonable, expense.[19] Even those who criticize application of the defense to typical take or pay contract provisions recognize it may be applicable where the general financial health of the purchaser is threatened.[20]

At least one court has been willing to give a more expansive interpretation to commercial impracticability. In *Aluminum Co. of America (ALCOA) v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa.1980), the issue concerned the availability of relief from a long-term contract whereby ALCOA agreed to process alumina, provided by Essex, into aluminum for Essex's use. The price for the processed aluminum was tied to two indexes. The demand charge was tied to changes in the Engineering News Record Construction Cost–20 Cities Average Index while production charges were tied to the Wholesale Price Index–Industrial Commodities (WPI–IC). One component[21] of the production charge tied to the WPI–IC constituted non-labor production costs including utility charges. In 1972, electricity costs skyrocketed largely due to the OPEC embargo and unanticipated pollution control costs. As a result, production costs outdistanced the indexed increase tied to the WPI–IC. The court found these occurrences unforseeable.[22]

In a decision to grant ALCOA relief, the federal district court compared and contrasted the doctrines of mistake of fact, impracticability and commercial frustration. Finding a substantial area of similarity among the three doctrines, the court held for ALCOA on the bases of commercial impracticability and frustration.[23] In so holding, the court found that the non-occurrence of an extreme deviation of the WPI–IC and ALCOA's production costs was a basic assumption on which the contract was grounded. Despite the price-fixing formula, the court found that it was clear that "ALCOA neither assumed nor bore the risk of the deviation beyond the foreseeable limits of risk."[24]

*Alcoa* has been soundly criticized, and even if an expansive view of *ALCOA* were adopted, the party presenting the defense of impracticability has the burden of establishing the defense.[25] I would not change the rigorous requirement of § 2–615. Although the ultimate determination of excuse due to impossibility of performance is a question of law,[26] the actual determination of whether a contract is factually or commercially impossible to perform is a question of fact.[27]

The defense of impracticability was raised in the trial court, but ONG failed to meet its burden of proof that despite what appears to be the assumption of a greater obligation under the contract, it neither assumed nor bore any risk for an increase in price beyond the forseeable limits of

**19.** *Am. Trading and Prod. Corp. v. Shell Int'l Marine, Ltd.*, 453 F.2d 939, 942 (2nd Cir.1972).

**20.** Medina, McKenzie, and Daniel, "Take or Litigate: Enforcing the Plain Meaning of the Take-or-Pay Clause In Natural Gas Contracts," 40 Ark.L.Rev. 185, 239 (1986). See also, Halpern, "Application of the Doctrine of Commercial Impracticability: Searching for 'The Wisdom of Solomon,'" 135 U.P.L.Rev. 1123, 1130, 1178 (1987), where Professor Halpern calls for "flexible and workable tools rather than all-embracing theories, and a continuing effort to keep emerging doctrines consonant with commercial reality." Professor Halpern also calls for a meaningful superceding doctrine.

**21.** Two other components, the fixed component and the labor production cost component, were also part of the production charge. *Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F.Supp. 53, 58 (W.D.Pa.1980).

**22.** Id.

**23.** *Aluminum Co. of Am. v. Essex Group, Inc.*, see supra note 21 at 70.

**24.** Id. at 72.

**25.** *Smith v. Zepp*, 173 Mont. 358, 567 P.2d 923, 927 (1977); *Sturgeon v. Fhifer*, 390 P.2d 727, 729 (Wyo.1964).

**26.** *Koppers Co. v. U.S.*, 405 F.2d 554, 558, 186 Ct.Cl. 142 (1968); *Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co., Inc.*, 7 Kan.App.2d 131, 638 P.2d 963, 969 (1981).

**27.** In re *Westinghouse Elec. Corp. Uranium Contract Litigation*, 436 F.Supp. 990, 991 (J.P.M.D.L. 1977); In re *Westinghouse Elec. Corp. Uranium Contracts Litigation*, 405 F.Supp. 316, 318 (J.P. M.D.L.1975); *Koppers Co. v. U.S.*, see supra note 26.

deviation under the Natural Gas Policy Act of 1978. ONG's argument that it lacked the ability to forsee the possibility of price deviation under the Act is unconvincing because among other reasons—at the time this contract was executed, *the Act had been in effect for almost three years.* It does appear, however, that ONG at least alleged that enforcement of this and similar contracts would severely impinge upon ONG's overall financial health. In evaluating this argument, the significance of the expense must be considered in the context of total revenues.[28] Although ONG alleged that enforcement of the contract would result in bankruptcy, no competent evidence of this contingency was presented. The evidence was insufficient to show sufficient injury to require a grant of relief.

Not unlike the impracticability defense, neither the market-out nor the force majeure clause call for redress in the instant case. It should be recognized that the contract in question modified the common law definition of force majeure and that contractual terms negotiated between consenting parties may alter the common law definition. Depending on the facts of each case, there may be instances where the market-out clause, the force majeure clause, or commercial impracticability may provide viable questions of fact for the jury. Because none of these mitigating circumstances are present in the record, I join the Court's decision to reverse.

---

28. *Florida Power and Light Co. v. Westinghouse Elec. Corp.*, 597 F.Supp. 1456, 1479 (E.D.Va. 1984).